# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## NORFOLK DIVISION

ALLEN L. LANCASTER           )
172 North Liberty Spring Rd.     )
Suffolk, VA 23434            )
                               )
      and              )     Case No. 2: __19cv95__
                               )
BARBY EARL WILSON          )
5305 Roves Ct.                )
Virginia Beach, Va 23464     )
                               )
      and              )
                               )
RICHARD ARNOLD            )
2113 Road M                 )
Emporia, KS 66801          )
                               )
      and              )
                               )
MICHAEL BELT              )
17722 North 79th Ave.        )
Glendale, AZ 85303         )
                               )
      and              )
                               )
WILLIAM C. BLAIR           )
2658 Widdy Bostwick Ln.     )
Jamestown, NY 14701       )
                               )
      and              )
                               )
RICK P. BRADLEY            )
2580 Grummer Lane         )
Conway, Arkansas.          )
                               )
      and              )
                               )
ANDREW CALHOUN          )
3269 East Bonnie Drive      )
Oak Creek, WI 53154       )
                               )
      and              )

MARTHA CARSON                          )
7148 State Route 329                   )
Guysville, OH 45735                    )
                                       )
        and                            )
                                       )
TIMOTHY DEMY                           )
7 Ellen Rd.                            )
Middletown, RI 02842                   )
                                       )
        and                            )
                                       )
JOSEPH DUFOUR                          )
1755 Campbell Rd.                      )
Waxahachie, TX 75167                   )
                                       )
        and                            )
                                       )
ALAN GARNER                            )
9844 Rosemont Ave., Apt 205            )
Lone Tree, Co. 80124                   )
                                       )
        and                            )
                                       )
JOHN GORDY                             )
371 Mill Hamlet Rd. NW                 )
Charleston, TN 37310                   )
                                       )
        and                            )
                                       )
FURNISS HARKNESS                       )
400 Green Acres                        )
Memphis, TN 38117                      )
                                       )
        and                            )
                                       )
TOM KLAPPERT                           )
7699 Kuhn Road                         )
Greencastle, PA 17225                  )
                                       )
        and                            )
                                       )
MICHALE LAVELLE                        )
13921 East Poelstra Street             )
Vail, AZ 85641                         )

and )
)
GEORGE W. LINZEY )
1111 Seacoast Drive #61 )
Imperial Beach, CA )
)
and )
)
JAMES LOOBY )
1713 County Rd. 318 )
Early, TX 76802 )
)
and )
)
WALKER MARSH, JR. )
125 Whisperwood Blvd. )
Slidell, LA. 70458 )
)
and )
)
DENISE Y. MERRITT )
4405 Biway Cir. )
Fayetteville, NC 28311 )
)
and )
)
DAVID MITCHELL )
1423 Norton St. )
Durham, NC 27701 )
)
and )
)
JAIRO MORENO )
2009 Oak Brook Dr. )
Portland, TX 78374 )
)
and )
)
RENE PORTER-STEWART )
2028 Farmdale Lane )
Spearfish, S.D. 57783 )
)
and )
)

RAFAEL J. QUILES                          )
203 Orchard Grove Place                   )
Oldsmar, FL 34677                         )
                                          )
        and                               )
                                          )
DANIEL ROYSDEN                            )
305 Sandalin Lane                         )
Peachtree City, GA 30269                  )
                                          )
        and                               )
                                          )
MARY HELEN SPALDING                       )
610 Walk the Plank                        )
La Jolla, TX 78560                        )
                                          )
        and                               )
                                          )
ARMANDO TORRALVA                          )
6637 LaBianca Dr.                         )
Corpus Christie, TX 78414                 )
                                          )
        and                               )
                                          )
DAVID S. WILDER                           )
 105 La Salle St.                         )
Wilmington, NC 28411                      )
                                          )
                                          )
        v.                                )
                                          )
                                          )
THE SECRETARY OF THE NAVY                 )
Room 4E686 - The Pentagon                 )
Washington, D.C. 20350-1000               )
                                          )
        and                               )
                                          )
The Chief of Naval Personnel              )
701 South Courthouse Road                 )
   Arlington, Virginia 22204              )
                                          )

and                                      )
                                         )
The Navy Chief of Chaplains              )
2000 Navy Pentagon, Room 5E270           )
Washington, D.C. 20350                   )

## COMPLAINT

## I. INTRODUCTION AND BACKGROUND

1.      This complaint raises claims of retaliation by the Navy Chaplain Corps (the "CHC") and

some of its senior chaplains against these plaintiffs for various lawful exercises of their faith,

duties as Navy chaplains and other constitutional and statutory rights. It also raises claims of

unlawful interference with certain plaintiffs' religious speech, including preaching and religious

services;  and constructive discharge for some plaintiffs because the challenged retaliation

resulted in failures of selection ("FOS") leading to either involuntary early separation from the

Navy or forced early retirement before reaching 20 years service.

2.      This complaint is the continuation of a series of three federal cases brought by three

separate groups of Non-liturgical Navy chaplains[1] challenging denominational preferences,

discrimination and retaliation in the U.S. Navy and its CHC. That litigation began in 1999. The

D.C. District Court consolidated those three cases, explained below, into In re Navy Chaplaincy,

07-mc-269, in 2007. The claims here were severed with leave granted to file them in other

---

[1] The Navy categorizes its chaplains into four denominational groups generally based on
religious practices and beliefs: (1) Roman Catholic ("RC") (a single denomination); (2)
Liturgical Protestant, denominations that follow a set liturgy, follow a lectionary in their worship
services, wear vestments and baptize babies. They usually trace their origin to the Protestant
Reformation, e.g., Lutheran, Episcopal, Methodist; (3) Non-liturgical Protestant. Faih groups
which do not follow a set liturgy or a lectionary, emphasize Bible preaching and baptize adults,
e.g., Baptists, Bible churches, Pentecostal and Charismatic churches, congregations and
fellowships; and (4) Special Worship, small Christian and non-Christian denominations with
unique worship needs, e.g., Orthodox, Muslim, Jewish, Seventh-day Adventist, and other
liturgical churches claiming to be "Catholic" but not allied with Rome.

jurisdictions and/or venues.

   a.   The Chaplaincy of Full Gospel Churches ("CFGC") and eight of its chaplains

filed suit in the D.C. district court, 11/5/99. Chaplaincy of Full Gospel Churches, et al., v. Danzig

[then Sec. of Navy], et al. [various subordinate Navy officials] ("CFGC"), 99-cv-2945 (D.D.C.),

ECF No.1.[2]

   CFGC, a recognized Department of Defense ("DOD") chaplain endorsing agency,

challenged Navy and CHC policies and practices that discriminated against CFGC, its chaplains

and chaplain candidates in accessions, promotions, continuation on active duty and other

personnel actions because of its chaplains' charismatic or "Full Gospel" Non-liturgical religious

beliefs and practices. The Navy commissioned 32 CFGC chaplains between DOD's July 1984

recognition of CFGC as a chaplain endorsing agency and November 1999 when it filed suit; only

seven had been promoted to Lieutenant Commander ("LCDR"), a promotion rate of 22% versus

the 80% statutory promotion LCDR rate, see 10 U.S.C. § 523 (establishing Navy Officer grade

limits); none of the seven had been promoted to commander ("CDR"), a zero promotion rate

versus the average expected CDR promotion rate of 60-70%.

   CFGC's Army and Air Force chaplains' success contrasted starkly with its Navy

experience. The Army appointed as active duty Army chaplains four former CFGC Navy

chaplains, three separated for "failure of selection" ("FOS") to LCDR, and one not continued

past his initial 3 year tour. All four were promoted to Major (the Army equivalent of LCDR), and

two were promoted to Lieutenant Colonel (Army equivalent of CDR) before retiring or being

---

   [2] CFGC initially filed suit as an organizational plaintiff and as representative on behalf of
its endorsed Navy chaplains. Eight of its Navy and former Navy chaplains joined the suit as
individual plaintiffs. The District Court dismissed CFGC as an organizational plaintiff but
allowed it to remain as a representative of its CFGC endorsed Navy chaplains.

forced to retire because of age and/or time in grade. One of the LTC chaplains was the one the Navy did not continue on active duty.

Acts of retaliation by senior Navy chaplains against CFGC chaplains for the exercise of their faith included poor fitness reports ("fitreps"); prejudicial assignments; changing previous agreements or assignments in ways that harmed the CFGC plaintiffs financially, emotionally and professionally; communicating false negative information about CFGC and its chaplains to commanders and selection board members; actual harassment and retaliation on the job, see e.g. Roysden and Merritt, and allowing chaplains theologically hostile to CFGC and its chaplains' beliefs and worship practices serve as promotion board members using practices that guaranteed CFGC candidates' FOS.

b.      Adair, et al., v. England [then the Secretary of Navy], et al., 00-cv-566, filed 3/17/00, was the second chaplain case filed in the D.C. District Court. The 18 Non-liturgical active duty, retired, and Reserve chaplains challenged Navy religious and denominational preferences; retaliation and discrimination in CHC promotion, selective early retirement ("SER") and assignments; and a pattern and practice of senior chaplain retaliation and/or interference with Non-liturgical (or "evangelical") chaplains' worship services, teaching, and speech.[3] See Adair v. England, 31 F.Supp.2d 31 (D.D.C. 2002) (explaining Adair and CFGC plaintiffs' ). They sought and were granted class action status on behalf of all Navy Non-liturgical chaplains. See Adair v. England, 209 FRD 5, 12-12-15 (D.D.C. 2002) (approving class action). CFGC and Adair were combined for pretrial discovery and motions to facilitate case management and discovery.

Twenty-five additional non-liturgical chaplains requested permission to join Adair as

---

[3] Ron Tomlin was dismissed from Adair after he won a retroactive promotion CDR and assignment to active duty in a separate action challenging decisions by the Navy Board of Correction for Naval Records ("BCNR") and the Secretary.

plaintiffs before the court considered and granted class action status. The court initially granted permission for them to join, but after more than a year's delay, the court denied their joinder motion after class action status was granted. Twenty-three of those 25 rejected chaplains later joined the 2006 Gibson v. U.S. Navy litigation, after the Adair plaintiffs requested the class be dissolved. This followed the District Court's (i) permitting the Navy to discharge Adair's last active duty plaintiff, destroying the Adair class and (ii) refusal to apply strict scrutiny to the Navy's chaplain promotion procedures contrary to the court's previously stated law of the case. See Adair v. England, 217 F.Supp.2d 7, 14-15 (D.D.C. 2002).

CFGC and Adair were combined for pretrial discovery and pretrial motions to facilitate case management and discovery.

c.      Gibson, et al., v. U.S. Navy,  06-cv-1696 (RMU), was originally filed in the Northern District of Florida, 3:06-cv-187, in May 2006, by 41 Non-liturgical Navy chaplains and the Associated Gospel Churches ("AGC"), an evangelical Christian Chaplain endorsing agency.[4] One AGC chaplain was an Adair plaintiff; other AGC chaplains who experienced gross discrimination and retaliation sought to join Adair before it became a class action and joined Gibson which sought to represent a class of Non-liturgical chaplains.

Gibson was transferred to the District of Columbia over the plaintiffs' protests. Many Gibson plaintiffs specifically directed their counsel not to file their case in the District of Columbia because CFGC/Adair case law was hostile to the plaintiffs and contrary to law. The courts rejected plaintiffs' argument no competent attorney would file a military chaplain religious discrimination case in the District of Columbia given its precedent and plaintiffs' directions,

_____

[4] AGC filed as a plaintiff in its own right and in its representative capacity for its Navy chaplains.

failing 28 U.S.C. § 1404(a)'s transfer criteria. After <u>Gibson</u>'s appeal process ran its full course,

the District Court consolidated <u>CFGC</u>, <u>Adair</u>, and <u>Gibson</u> into one case, <u>In re Navy Chaplaincy</u>,

("<u>Chaplaincy</u>") 07-mc-269, <u>see</u> ECF No.1.

   d. <u>Chaplaincy</u>. The District Court allowed no discovery in <u>Gibson</u> before or after

consolidation. The District Court then imposed a stay on all discovery in 2009 when the

Chaplaincy plaintiffs moved to compel production of discovery, including unredacted portions of

the DOD Inspector General (DODIG) investigation into the CHC's FY 97 and 98 commander

promotion boards. The District Court rejected plaintiffs' motion and consistent efforts to lift the

stay and compel the Navy to produce documents and other discovery it had refused to provide.

The D.C. Circuit denied plaintiffs' motion for a mandamus to lift discovery before summary

judgment. Preserving testimony of older plaintiffs was the only <u>Chaplaincy</u> discovery allowed.

   After the D.C. Circuit denied plaintiffs' 2013 motion for a preliminary injunction

addressing the CHC's unique promotion procedures described below, the District Court rejected

the plaintiffs' arguments the Navy's fraudulent concealment of the causes of action and other

equitable considerations required the six-year statute of limitations ("SOL") waived. The court

applied D.C. Circuit precedent holding the SOL was jurisdictional.[5] The District Court then

denied the plaintiffs' motion for class action. After a series of subsequent motions addressing

jurisdiction, the court divided plaintiffs' remaining claims into three constitutional claims

addressing challenges to CHC procedures and practices and "ad hoc" claims including

---

[5] The District Court acknowledged <u>U.S. v. Kwai Fun Wong</u>, —U.S. —, 135 S.Ct. 1625, 1633 (2015), held the government had the burden to show Congress's clear intent. Otherwise, courts were to apply normal, appropriate equitable factors to the SOL at issue. a SOL's words had to unequivocally communicate Congress's intention the SOL was jurisdictional and Nonetheless, the District Court rejected plaintiffs' attempts to schedule an interlocutory appeal in order to apply <u>Wong</u>.

interference with the form of prayer (Count 9), constructive discharge (Count 11), and retaliation (Count 12).

The District Court granted summary judgment to the Navy on the constitutional claims, 8/30/18 and the Court's 11/8/18 Order, ECF No. 344, severed the remaining "ad hoc" claims granting the plaintiff's until March 1, 2019, to refile in other venues and jurisdictions. This Complaint complies with the D.C. District Court's order and addresses these plaintiffs' retaliation, constructive discharge and interference with certain plaintiffs' religious speech, practices  and forms of prayer.

## II.  JURISDICTION AND VENUE

3.      Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331, 1343, and 5 U.S.C. § 702. Venue is appropriate under 28 U.S.C. § 1391(e) since the defendants are a federal agency and its officials and are located in this District's territory along with some plaintiffs.

### Joinder Is Appropriate with These 26 Plaintiffs

4.      The 27 plaintiffs in this case reside in 15 different states. Fed. R. Civ. P. ("Rule") 20(a) (1) allows plaintiffs to join in one action if:

> (A) they assert any right to relief jointly, severally, or in the alternative specific to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and
> (B) the question of law or fact common to all plaintiffs will arise in the action.

5.      Some of these plaintiffs' claims arise at different times, in different places, and from interactions with different defendants but others arise at specific locations from interactions with the same defendant(s). Careful analysis of plaintiffs' underlying claims show common themes of retaliation occurring at specific locations, arising from the same or similar sources and common expressions of retaliation and religious hostility. These include and often involve the same senior

chaplains, senior chaplains from specific denominations, offices or levels of authority, whose

retaliation arises because of their hostility to other denominations or challenges to their tyrannical

behavior, attitudes and discriminatory behavior.

6.      Exhibit 1 provides a table identifying eight sources for the 26 plaintiffs' claims and their

overlap and intersection with other plaintiffs' claims. These are: Charismatic/Pentecostal (10

plaintiffs), a distinct religious group whose beliefs, and style, and manner of worship services are

rejected by many denominations; Naples (3) and San Diego (4), two distinct base chapels whose

command chaplains retaliated against and destroyed multiple plaintiffs; a board member hostile

to a plaintiff (6); offending a Catholic (12); offending the Chief (11); offending a Liturgical

Senior chaplain (14); and retaliation or hostility from the Chief's office (9). For example, RC

chaplain CAPT Rock is alleged to have retaliated against Pentecostals Gordy (Naples) and

Morino (Okinawa) and two other non-liturgical chaplains in Naples (DuFour and Torralva).

Plaintiffs allege no Pentecostal or charismatic supervised by CH Rock was ever promoted.

7.      The retaliation claims arising from Naples and San Diego involve RC command

chaplains openly hostile to non-Catholics, especially Non-liturgical evangelical and

charismatic/Pentecostal.

8.      Exhibit 1 also illustrates negative effects of the unconstitutional influence of Catholics

due to their reserved seat on every CHC selection board not requiring admirals until FY 2003,

following the Chaplaincy litigation challenge to the practice. This denominational preference

explains why RCs increased their percentage at every rank from Lieutenant ("LT")

(approximately 20%) until they were one third of CHC Captains ("CAPT"). Their large numbers

at the higher ranks and their reserved board seat facilitated the use of the CHC's blackball

promotion system described below as an unchecked and unaccountable instrument of retaliation

and denominational advancement.

Exhibit 2, "38 Years of Denominational Preference" by Dr. Harald R. Leuba, PhD, shows a consistent denominational hierarchy and preference in promotion rates linked to those denominations that had a Chief of Chaplains. Catholics have the highest promotion rates in every rank, followed by Liturgicals, Southern Baptists, with minority Non-liturgicals and  Special Worship groups last or next to last.

The large number of RC Navy admirals saw no problem with this practice. The number of RC CAPTs  and CDRS has dramatically decreased since their private board seat was revoked in FY 2003.

9.      This grouping of plaintiffs supports and meets Rule 20's criteria. It allows the efficient use of discovery and depositions, conserving resources and supports the speedy resolution of specific groups of claims by allowing controlling questions of law to be decided and applied, e.g., is a challenged practice or retaliation tool a denominational preference or result in one triggering scrutiny of the challenged practice. This facilitates judicial economy. Plaintiffs reserve the right to move for class action status if additional chaplains join the suit after its filing.

**THE NATURE OF THIS CASE AND PLAINTIFFS' CLAIMS**

10.     This case addresses 27 Non-liturgical Navy Chaplains plaintiffs' longstanding claims of retaliation and low fitness reports ("Fitreps"); constructive discharge because of unlawful FOS; and interference with their ministry, speaking, preaching and worship services based on denominational prejudice.

This retaliation resulted in plaintiffs' FOS and either separation for FOS or constructive discharges. Senior Navy chaplains are the perpetrators and sources of these claims, primarily Roman Catholic and/or Liturgical Protestants, in positions of authority, influence and supervision

representing and acting under the authority of the Navy and its CHC.  The actions represent a

pattern and practice of illegal retaliation and discrimination based on denominational hostility

and prejudice.

### Chaplains' Role as Military Denominational Representatives

11.     Chaplains are religious ministry professionals ("RMP"), leaders or clergy of a church,

denomination or religious organization endorsed by the organization to represent it to the

military. Endorsement is the religious organization's certification the RMP meets the DOD's

educational requirement, the service's ministry experience requirement and is qualified to

perform the ministry, ordinances and worship rites and services necessary to meet the free

exercise needs of the endorser's military members. DOD Instruction 1304.28, Encl. 2, ¶ E2.1.7 .

In other words, chaplains represent their denomination or Endorsing Agent. Loss of endorsement

(a loss of professional qualification) is the Endorser's sole decision regardless of reason and

requires separation from the Service. 10 U.S.C. § 643.

12.     In keeping with their religious nature and role, chaplains have rank without command,

i.e., the authority to exercise the Sovereign's authority and give orders with the expectation they

will be immediately obeyed. Secretary of the Navy Instruction (SECNAVINST) 1730.7B, Subj:

Religious Ministry Support Within the Department of the Navy, ¶ 4.a, and Navy regulations limit

chaplains' activities solely to religious duties, barring chaplains from the duties and authority

common to all other naval officers:

> In accordance with Article 1063 of [Navy Regulations, 1990], chaplains shall be
> detailed or permitted to perform only such duties as are related to ministry
> support.  Chaplains shall not bear arms.  Chaplains shall not be assigned collateral
> duties which violate the religious practices of the chaplain's faith group, require
> services as director, solicitor, or treasurer of funds other than administrator of a
> Religious Offering Fund, serve on a court-martial or stand watches other than that
> of duty chaplain.  (Emphasis added).

If captured in time of war, chaplains are categorized as "retained personnel" under the Geneva Convention, required to perform ministry and are exempt from provisions of the Code of Conduct requiring resistence and escape.

### The Nature of the Case

13.     This is not an anti-Catholic suit or against the Roman Catholic church per se. The focus here is on senior chaplains' retaliatory actions and abuse of authority, not beliefs, and the CHC's affirmance and approval of those illegal actions. Plaintiffs attack Navy personnel systems' procedures and practices that grant senior chaplains unbridled authority and discretion over the promotions and careers of other chaplains with no accountability. IG evidence shows these procedures become uncontrolled instruments of retaliation.

14.     Within the CHC there are natural denominational networks. Plaintiffs allege some of these networks have become conduits for senior chaplains to identify junior chaplain who oppose or challenge senior chaplains' abuse of authority and interference with ministry based on a denominational perspective. These individuals are seen as problems or opponents in the eyes of some chaplains who resent opposition to denominational abuse. These conduits, combined with the unbridled discretion protected by the secrecy of many Navy personnel management procedures, convert these challenged procedures into anonymous instruments of retaliation against which there is no defense absent judicial intervention. IG inspections show these procedures have no "effective guarantees" that exclude denominational factors from influencing or determining promotions. This offends the Establishment, Free Exercise and Due Process clauses and other constitutional protections.

15.     These procedures and practices include the following:

     a.     Promotion procedures encouraging anonymous denominational preferences,

prejudices and uncontrolled retaliation. IG investigations have identified three specific chaplain promotion procedures unique to the Navy which use anonymous instruments of retaliation with no accountability. At the time many of these challenged acts of retaliation occurred, Navy CHC promotion boards were staffed primarily by chaplains selected by or approved by the Chief of Chaplains ("Chief").

(i).      The Navy's chaplain promotion board voting system with its small number of board members, 10 U.S.C. § 613a' bar of board proceedings disclosure, the anonymity of board member votes, and the board member voting procedure's choice of one of five subjective promotability ratings that determine promotion, 0, 25, 50, 75, 100. Voting Machine at Exhibit 3.

The Navy Inspector General ("NIG") documented the unchallenged fact this voting procedure allows one board member to both (A) anonymously deny promotion and torpedo a chaplain's career with no accountability and/or (B) manipulate the board to allow low-quality chaplains to be promoted. This process is called  "zeroing out", see NIG testimony of RADM Black describing "zeroing out" and its effect, Exhibit 4, and CDR Washburn (NIG complainant) describing its common occurrence on promotion boards she had served on, Exhibit 5 .

This "blackball" voting procedure places unbridled authority in hands of a denominational representative acting as a government official with no means to ensure accountability and denominational neutrality when selecting junior denominational representatives for promotion. Despite the NIG and other evidence describing the voting system's use as an instrument of retaliation, prejudice and or favoritism, the Navy has allowed it to continue and defends its unconstitutional use.

(ii).     Having other chaplains brief a candidate's record of which no record is kept after which the board votes for promotion based on the briefer's evaluation. NIG testimony shows the critical importance of a briefer's briefing for a chaplain's promotion and the lack of objective criteria evaluating its accuracy. Omitting important positive factors, whether intentional or unintentional, such as special accomplishments, a rater's positive comments and/or comparisons, overcoming of obstacles, difficult assignments, and awards denies a promotion applicant the full and honest consideration of his record law and regulations require. Omitting important negative information such as discipline infractions, e.g., driving under the influence ("DUI"); administrative action; specific negative counseling; or a rater's negative comments provides an unfair advantage to a chaplain who would otherwise appropriately FOS. The Army and Air Force require each board member to personally review and evaluate/score each candidates' record and record each member's vote.

(iii)     Using the Chief or his/her Deputy as a chaplain selection Board President. The Chief and Deputy are rear admirals (RADM) and given a great deal of deference by board members of lesser rank both within and outside the CHC. The NIG investigation of the FY 09 CHC CAPT board documents the negative impact of a subtle and seemingly inconsequential comment by the Deputy, RADM Baker. The FY 97-98 boards IG investigations also demonstrates the impact of the Chief; RADM Holderby admitted (A) he lobbied for a candidate from his own denomination previously FOS and (B) he could influence junior board members as a RADM and Chief.

Several plaintiffs allege the Chief or Deputy were personally hostile to them yet served on promotion boards that denied them promotions.

16

b.      Granting Roman Catholics unlawful, unaccountable control over promotion boards by placing at least one RC board member on every CHC promotion board for 54 years, beginning in FY 49.[6] This unfettered access to the procedures identified in "b" above combined with the practice of RC chaplains meeting together regularly and exchanging information about non-RC chaplains perceived to be hostile to RC interests or chaplains allowed RC chaplains to retaliate against such perceived "enemies" through promotions with impunity. This gave rise to the adage, "don't cross a Roman Catholic if you want a career as a Navy chaplain." RC chaplains openly bragged about their network and its illegal effect on chaplains' promotions and careers. See Declaration of LCDR Jerry Dickerson, Exhibit 7 ¶¶ 13-15 (senior RC chaplain telling him his career was finished because of a false report by another senior RC Chaplain)

c.      Failing to provide "effective guarantees" denomination or perceived insults or wrongs based on denominational differences did not become factors in chaplain promotion proceedings and decisions. The testimony of numerous plaintiffs is they were threatened by senior chaplains who claimed to have connections with the either the Chief or knew Senior chaplains who would be on the boards. See e.g., Arnold, Roysden, Wilder. Evidence will show there were denominational networks for large denominations whose chaplains occupied senior billets and often served on selection boards.

d.      Allowing board members to discuss a chaplain's record based only on a board member's briefing with no record of the comments or guarantees that forbidden, extraneous or unrelated factors outside the record are not introduced into the discussion. IG promotion board investigations show this has happened.

e.      Failing to provide "effective guarantees" assignments were made on factors

_____

[6] The Navy provided these records in Sturm v. Danzig, 99-cv-2272 (S.D. Cal). Exhibit 6.

neutral to denomination, i.e, denomination did not become a negative factor in making assignments. For chaplains to be successful and promoted, the CHC requires they have certain assignments, including operational tours with either Marines or on a ship. Assigning a chaplain to a "billet" (Navy term for a duty assignment) below the chaplain's rank or to successive nonoperational billets was and remains a means of retaliation. E.g., Arnold, Carson, Dufour, Gordy, Roysden, Spalding, Wilder.

Evidence shows there was always one RC in the detailer's office as either the Senior or Junior Detailer; very other Senior Detailer was an RC until the CFGC and Adair litigation began, although RC's were only about 20-25% of the CHC. That RC detailer primarily handled RC assignments, but Roysden's testimony shows he responded to RC requests affecting perceived RC enemies.

f.     Failure to ensure the integrity of the CHC official file system so important documents were not removed or documents delivered were actually placed in a chaplain's file. The Detailer's office was co-located with the Chief's office until shortly before the chaplains' litigation. Several plaintiffs report great difficulty attempting to ensure favorable fitness reports were included in their official file for promotion board review. See, e.g., Bradley, Lancaster.

CAPT Stafford, the Navy's Minority Affairs Officer, investigated the CHC's fiscal year ("FY") 1997 and 98 Commander boards. Exhibit 8. He testified to the DODIG investigating those same boards that he received an anonymous tip that one of the questionable RCs selected for promotion, CH Clark, had received a DUI, an offense that disqualified him for promotion. CAPT Stafford obtained a copy but did not find it in the chaplain's file the board reviewed.

CH Clark's missing  DUI suggests it had been removed illegally, a deliberate act of preference by some senior chaplain to enhance the candidate's chance for promotion. Other

examples abound. This points to the unrestrained influence and control over chaplains' careers

and their records by the Chief of Chaplains, his Deputy, and senior chaplains.

g.      Failure to ensure senior chaplains assigned to command chaplain billets,

assignments the Chief controlled or approved, were not denominationally hostile to others.

Senior RC chaplains at Balboa Naval Medical Center in San Diego, CA, and Naples, Italy, had

records of being pro-RC, pro-Liturgical and anti-Non-Liturgical/Evangelical. Evidence in

Chaplaincy shows Naples was known as the Evangelical graveyard and the CHC's indifference

to gross discrimination against evangelical chaplains and their congregations by Naples' RC

command chaplains. Similar egregious discrimination occurred at San Diego under CH Young.

h.      Senior chaplains providing unregulated input into subordinate chaplains' fitness

reports or actually drafting such reports without objective criteria. For some of these plaintiffs,

this has resulted in their damnation by faint praise, exclusion of significant events, contributions

or accomplishments and/or subtle negative comments.

## IV.  PARTIES

### A.  Chaplain Plaintiffs' and Their Claims

16.     Each of the 27 individual chaplain plaintiffs is identified alphabetically for ease of

reference below with each plaintiff's original case indicted by ( ). Each plaintiff has suffered

injury(s) as a result of the Navy's retaliation, messages of denominational preference, and other

harm as described herein which has deprived them of fair and equal opportunity for promotion

and a career in the Navy, and the corollary injuries flowing from (a) deprivation of their First and

Fifth Amendment and statutory rights, (b) violations of statues and regulations; and (c) the harms

identified herein. All plaintiffs have suffered from defendants' message of second-class

citizenship expressed through their retaliation, retaliatory acts, and hostility to plaintiffs' Non-

liturgical beliefs and practices.

Individual plaintiffs' incidents and injuries identified herein are used as examples to provide factual support and notice of their claims, they are not a complete list of such injuries.

a.      RICHARD ARNOLD (Gibson) lives at 2113 Road M, Emporia, KS 66801-8104. CH Arnold was endorsed by the Southern Baptist Convention ("SBC"), commissioned in the CHC's Theological Student Program as an Ensign in 1982 and entered active duty as a Navy chaplain in August 1987. He entered the Navy with 3 years prior enlisted service in the Air Force where he rose to the rank of Sargent. After various assignments, he was selected to go to postgraduate school in 1993 and completed his work in 1994. During this time he was promoted to LCDR.

He then reported to Mayport, FL where he worked under the supervision of  Roman Catholic ("RC") Command Chaplain Charles Eis. CH Eis' strange behavior and conduct led CH Arnold and another chaplain at Mayport, then LCDR Aufderheide, to intercede with the commanding officer to have CH Eis psychologically evaluated for his fitness for service. CH Eis banished CH Arnold from the chapel for his attempt to help CH Eis and protect his command and the Navy. Catholic chaplains accused CH Arnold of having "destroyed Charlie's career." CH Eis was later chosen for Selective Early Retirement.

An acquaintance notified CH Arnold that RC CH (CAPT) Oddo made a comment at a Senior CHC leadership meeting, "There is no place in the Navy for Rich Arnold." This meritless statement was a message from RC CH Oddo to other senior chaplains, particularly Catholics, who might serve on promotion boards, that CH Arnold was "damaged goods." This statement had no other context except retaliation, given CH Arnold's outstanding record and service.

That retaliation became evident in CH Arnold's assignments following Mayport. The

CHC detailed CH Arnold to LT (O-3) billets although he was a LCDR (O-4). Because the promotion system operates with secret votes and small numbers, CH Arnold believes he was blackballed in retaliation for his role in having CH Eis evaluated and/or as a result of the false information and character assassination related to his role in reporting a senior chaplain's misconduct and strange behavior. The BCNR denied his appeal of his non-selection to CDR.  CH Arnold is now retired after multiple FOS.

b.      MICHAEL BELT (Adair) enrolled in the Navy Chaplain Candidate Program ("CC") as a United Methodist; he changed his endorsement to the Non-liturgical Church of the Nazarene before entering active duty in September 1991. He was stationed on Okinawa from 1991 to 1993. There his Liturgical Protestant rating chaplain, CH Ha, gave him a poor fitness report after CH Belt failed to support CH Ha's prayer breakfasts by selling tickets. This same Liturgical Protestant chaplain later berated CH Belt for preaching that "men who call themselves Christians should live as Christians" and gave CH Belt a low mark on his fitness report. CH Belt and another Non-liturgical chaplain later reformatted a Protestant service in San Diego with low attendance and the congregation grew from 40 to approximately 130. His rating Liturgical Protestant chaplain recognized CH Belt's accomplishment by calling his style of worship "hogwash." The Liturgical Protestant then took over the service, changed it back to a Liturgical service and drove the congregation away, killing the service.

At his duty station at the Balboa Navy Medical Center in San Diego, he witnessed and experienced Liturgical bias, prejudice and retaliation against himself and other Non-liturgical chaplains from his RC command chaplain, CAPT Dave Young and the CHC. This included exclusion exclusively Liturgical chaplain meetings that made decisions that affected him and other Non-liturgical chaplains and seeing Catholic and Liturgical Protestant chaplains, whose

work output was below their peers, nonetheless being given higher fitness reports.

Plaintiff LCDR Roysden was stationed at Balboa with CH Belt. He testified at his 2004

CFGC/Adair deposition:

CH Young "hated Michael Belt with a passion" although CH Belt "was willing to do

whatever he could to make an impact in the hospital. He never seemed to tire, he loved being

with patients and with staff." [241:15-22]. CH belt and CH Smith developed a project providing

ministry to the operating rooms; at first, CH Young opposed it and didn't want them to be doing

it. After it got off the ground and was termed a success, CH Young tried to claim credit for it,

saying it would never have happened had he not suggested to those two chaplains that they go do

it. [241:23-242:22].

As a result of his superior chaplains' retaliation and denominational prejudice, CH Belt

was non-selected for promotion to the grade of Lieutenant Commander ("LCDR") by the fiscal

year ("FY") 1999 and 2000 chaplain promotion boards.

CH Belt joined the Adair litigation in 2000 at the rank of Lieutenant. As result of interest

in the litigation by other chaplains in the San Diego area, CH Belt organized a briefing session on

the Adair litigation for San Diego area chaplains with the approval of his supervising chaplain,

CAPT Lineback. Other senior chaplains in the Medical Command and the Office of the Chief of

Chaplains became very hostile, forcing CH Belt to find another location at the last minute. That

hostility became manifest later.

CH Belt became an invalid when Navy medical malpractice complicated and

compounded the injuries he received on active duty; he could walk only with great difficulty and

pain. The Navy started the process for a medical board to evaluate CH Belt for medical

retirement. However, due to the Navy's delay and broken promises, CH Belt was separated for

22

FOS in March 2006 due to the low Fitness reports, the product of the retaliation described above, despite the Navy's failure to complete the medical evaluation board. The Adair court rejected his attempt to obtain a TRO (Temporary Retaining Order) and allow the board process to be completed. His separation in an invalid state inflicted great distress and hardship on CH Belt and his family.

The CHC's hostility and opposition to allowing CH Belt to complete the medical evaluations necessary for him to complete a medical board and qualify for a medical retirement is a manifestation of the CHC's retaliation against CH Belt for challenging the CHC's denominational preferences, bias, and hostility to evangelical chaplains like himself. His injuries include the obvious messages of second class citizenship, denial of his rights and intense emotional stress on him and his family. CH Belt now resides at 17722 North 79th Ave. Glendale, AZ 85303.

c.      WILLIAM C. BLAIR (Adair)  resides at 2658 Widdy Bostwick Ln., Jamestown, NY 14701.  Before attending seminary, he had prior enlisted service in the U.S. Marine Corps from September 1972 to August 1976.  He became a Navy chaplain in July 1983 endorsed by the Non-liturgical Assemblies of God faith group and was recalled to active duty in September 1983, promoted to Lieutenant Commander and selected for post graduate school.

As a Non-liturgical  chaplain, he was required to be able to officiate at Liturgical Protestant services, but Liturgical Protestant chaplains were not required to know how to or to officiate at Non-liturgical services.

The Navy assigned him to Naples, Italy, after completing post-graduate school. Navy regulations required he fill a chapel education billet that matched his specialty code awarded after completing Post-graduate school. CH Blair's Liturgical command chaplain refused to assign him

that "P" coded billet and transferred him to a NATO organization and chapel in Naples. Finding there was no service for Pentecostal/charismatic military members in Naples, he initiated a "Full Gospel" worship service around 1992 despite great hostility from senior chaplains and lack of chapel support. His service became the largest on-base non-Catholic service. While the poorly attended liturgical General Protestant service received full support and funding, his well attended service had to improvise just to survive, including using a borrowed personal stereo amplifier to run the service's sound system.

The FY 97 CHC Commander selection board did not select CH Blair despite an outstanding record superior to many of those selected for promotion as shown by CAPT Stafford's investigation of the FY 97 and 98 CDR promotion boards (the "97&98 Boards) in response to LCDR Aufderheide's complaint of religious discrimination.

When CH Blair attempted to learn the cause of his non-selection, a senior CHC official told him his one rating (in 16 years of service) of 3 of 3 was the only indication in his record.  He appealed that rating and his non-selection to the Board of Correction of Naval Records which in effect informed him that there was nothing wrong with the board and that he had no basis for a complaint. His subsequent requests for an explanation were met with a "we can't talk about the board - it's a secret."

Following his second non-selection, the CHC told CH Blair to "either retire or be retired."  In the face of the Navy's threat and prejudice, he retired on September 1, 1999. The result of the Navy's prejudice, misconduct, and retaliation constitute a constructive discharge.

Examination of the Stafford Report's information after his retirement showed CH Blair's record was superior to many chaplains promoted; some had in their records the very things CHC senior officials had consistently said would keep a chaplain from being promoted, e.g., DUI.

24

The DODIG's follow on investigation of the 97&98 Boards found evidence of denominational preferences on both boards. It concluded a Catholic board member had retaliated against Protestant LCDR Aufderheide through negative comments resulting in Aufderheide's non-selection. Aufderheide alleged he had confronted RC CAPT Madden about his drinking and womanizing years before and Madden promised he would deny Aufderheide promotion.

The resulting <u>Chaplaincy</u> litigation exposed the Navy's blackball voting procedure that allowed one board member to anonymously destroy another chaplain's career. CH Blair had previously served with one of the FY 97 liturgical board members, CAPT G. Cooper, with whom he had experienced hostility over disagreements. Given CH Blair's record compared with others selected, he alleges he was the victim of that board member's retaliation, not unlike LCDR Aufderheide; or prejudice because of his Pentecostal background; and/or because the denominational preferences exhibited by the board necessarily discriminated against him and denied him a fair opportunity for promotion by illegally introducing religion and denomination into the promotion process.

d.      RICK P. BRADLEY (<u>Gibson</u>) currently resides at 2580 Grummer Lane, Conway, Arkansas.  He was endorsed by the Southern Baptist Convention, commissioned and entered active duty as a chaplain in December 1997. Following Chaplain School and training at Camp Lejeune, he was sent to Guam for his first assignment to the sub tender USS FRANK CABLE, AS40. He left Guam in December 1999 and transferred to Paris Island for the period January 2000 to September 2003, when he was reassigned to Marine Air Group at Beaufort, SC. As a result of a physical in his pre-deployment procedures, he was discovered to have an unknown blood disease. This led to a two-year period of multiple visits to Walter Reed Army Medical Center, Bethesda Naval Medical Center, and Johns Hopkins University, which finally determined

the cause of his medical manifestations was a reaction to anthrax. This made him ineligible for deployment and resulted in a medical board which subsequently discharged him. However, during the time when he was being evaluated, he went before a promotion board in March of 2002 for FY03, for which he FOS to LCDR despite outstanding fitness reports.

Prior to his revisiting Walter Reed, he worked with the Deputy Command Chaplain to ensure his file that appeared before the board was complete. However, when he reviewed his Officer Personal Data Sheet after the board, he found it had been substantially altered with blanks and other incorrect information, so much so that it did not accurately reflect in any meaningful way his history, education or other information relied upon by the board. There is no explanation as to how this information became corrupted. CH Bradley attempted to resolve this, but his command chaplain told him he needed to talk to the Chief of Chaplains office. That office told him he needed to work with his command chaplain. Before this could be resolved, CH Bradley was medically discharged. During his time on active duty, he was reprimanded by his senior chaplain for praying in Jesus' name at a graduation while assigned to Paris Island, although it is a practice consistent with his faith group's beliefs and practices.

CH Bradley's FOS to LCDR is believed to be the result of prejudice against him for his consistent, effective performance and insistence on following the dictates of his conscience, which included praying in the name of Jesus as authorized by his faith group despite criticism.

e.     ANDREW CALHOUN (Gibson) currently resides at 3269 East Bonnie Drive, Oak Creek, Wisconsin.  He began his career as a Navy chaplain commissioned as an Ensign in 1984 in the Theological Student Program and endorsed by the Church of God in Christ, a Non-liturgical denomination. He was subsequently given a superceding appointment to the CHC in 1988, came on active duty in 1990 and was assigned to the Naval Training Center, Great Lakes,

Illinois. He was then assigned to the USS BAINBRIDGE. Because of his involvement with a community service program, his ship was recognized as having the most outstanding community service programs. In fact, the name of the Navy award given to ships for community service is now known as the USS BAINBRIDGE Award, a recognition of the contributions CH Calhoun made to both the Navy and his ship.

His subsequent assignments included a tour at the Milwaukee, Wisconsin Coast Guard Station followed by postgraduate school, where he obtained a Masters of Theology degree, a reassignment to Okinawa for a one year unaccompanied tour, and then to Little Creek, VA. He was promoted to  LCDR in 1994.

Two weeks prior to the FY2001 CDR board, CH Calhoun received a revised fitness report delivered to him by FedEx which substantially reduced his final fitness report for the period he was at the Milwaukee Coast Guard Station. This report was written outside the window in which corrections were authorized to be made and he received no warning or opportunity to rebut it, nor an explanation of the basis for the change. He came to believe this report was instigated by RADM Iasiello since a letter accompanying the report indicated it had the approval of RADM Iasiello, who also served as the president of the promotion board before which the report was submitted. The apparent unfairness of the later report reduced, if not destroyed his chances for promotion. RADM Iasiello should have recused himself from consideration as board president given his involvement in the approval of the revised report, and subsequent difficulty in attempting to resolve the question. That and RADM Iasiello's apparent complicity in a retaliation scheme convinced CH Calhoun the Navy had become hostile to him, there was no place for him in the Navy CHC, and he submitted his resignation.

The CHC's animosity against him is further exemplified in its rejection of CH Calhoun's

request for release from the Navy in the early summer of 2001 to pursue civilian employment opportunities and minimize the impact of transition on his family. The Navy would not release him until February of 2002. The Navy's treatment of CH Calhoun is typical of the second class treatment afforded many Non-liturgicals and reflects a determined effort to insure that gifted and qualified Non-liturgicals are retaliated against because of their faith and removed from the service.

RADM Iasiello's and the CHC's retaliation and hostility denied CH Calhoun promotion to CDR, created a hostile environment, and resulted in a constructive discharge.

f.      MARTHA CARSON (CFGC) was commissioned in the United States Marine Corps in 1980 and served as a Marine until 1987 when she left active duty to obtain a Masters of Divinity Degree at Duke University, Durham NC. Beginning the process to become a Navy Chaplain under the endorsement of the United Methodist Church, she switched to CFGC's endorsement  before reporting for active duty. The Navy's and CHC's actions suggest Navy discrimination against her based on her identification as a CFGC endorsed chaplain. This discrimination took various forms, including: (a) unreasonable delay and changes in bringing her to active duty after she had changed her endorsement to CFGC and had quit her job based on a specific reporting date and ship assignment (USS Simon Lake) the CHC had previously given her; (b) denying her a fair opportunity for promotion by turning her prior outstanding military service into a detriment and liability and giving her assignments that made her non-competitive for promotion; (c) causing economic and other injury by unreasonably delaying her discharge orders and interfering with her opportunity to seek commissioning in the Army Chaplain Corps. She left the Navy after her failure of selection (FOS) of promotion to the grade of Lieutenant Commander ("LCDR"), was commissioned as an Army chaplain, promoted to Major (the Army

equivalent of LCDR), and retired April 2008 after completing 20 years commissioned service. She lives at 7148 State Route 329, Guysville, OH 45735.

CH Carson's injuries include being treated as a second class citizen because of her faith, denied a fair opportunity to compete for promotions in the Navy, denial of promotion in the Navy, delaying her promotion to Officer pay grade 4 ("O-4")[7] (Major) because she had to essentially start her career over again in the Army, subsequent denial of promotion to O-5, and the financial delay in bringing her to and releasing her from active duty as mentioned above.

g.      CH (CDR) TIMOTHY DEMY (Gibson) resides at 7 Ellen Road, Middletown, Rhode Island.  He was endorsed by the Bible Churches Chaplaincy, commissioned in the CHC in 1981 and came on active duty in July 1984. He was promoted to LCDR in 1988 and CDR in 1993.

CH Demy was the honor grad for the Chaplain Advanced Course and was assigned to the Chief of Chaplains Office in the summer of 1990 where he worked in the detailing office first as admin officer and then as the junior detailer. CH Demy has testified denominational considerations color or influence all detailer's office decisions and many of the CHC's critical personnel decisions. CDR Demy Declaration (Exhibit 9) ¶¶ 11, 29 ("as in all other matters chaplains in the Chief's office and detailing, denominational awareness was always part of the deliberations of that process") (emphasis in original), 40. He stated "if released from my oath of secrecy about [selection board] proceedings, I would have relevant and material information concerning the impact of denomination on the SERB selections." Id. at ¶ 44.

---

[7] Military services often identify rank with its equivalent paygrade, *e.g.*, O-4, MAJ or LCDR.  The "O" stands for "Officer" and the number equates to the grade above entry level, here 4.

CH Demy was assigned to the Naval Chaplain School as the supervisory course officer after a tour with the Coast Guard Headquarters, followed by attendance at the Naval War College from March 1998 to 99. He was the first chaplain designated the honor graduate and was subsequently assigned to teach at the Naval War College.

CH Demy FOS to CAPT. He was told this was due to "lack of operational time." However, his fitness reports all show top 1%, he worked for two Chiefs of Chaplains, and he was specifically requested to go to the Chaplain School and the Naval War College. Any lack of "operational" time was not due to a failure on his part, but a result of the system which assigned him to these important positions based on his demonstrated abilities and skills.

Evidence suggests the real reason for CH Demy's FOS was retaliation by the CHC and RADM Black, reflecting hostility against his non-denominational beliefs and professional jealousy over his recognized skills and abilities.

45.     I was told by a reliable source shortly after one of my failures to be selected by the CAPT board on which the Chief of Chaplains, RADM Barry Black was President, either 2002 or 2003, that during the board break, *i.e.*, not during the actual board deliberations, that RADM Black made a comment to [another board member] regarding my record: "I know what you are trying to do Norm. Demy is a good commander and the Navy needs good commanders. If we pass him over, he can sit in his office and write his books."

46.     This was reference to the fact that on my own time I have published extensively on religious issues. RADM Black's comment falsely implied that I had used government time and resources to write books which was a false and prejudicial remark. It was also an irrelevant reference to a personal and private activity. It would be the same as if he had said, "this way he can play more golf", something I do not play, or "coach Little League soccer." After hours legal activities should not be a part of board considerations or discussions, formal or informal. The question for each board member is does my record as a CDR (which RADM Black indicated was good) indicate I have the potential to perform satisfactorily the duties at the CAPT level. The statement itself reflects personal prejudice or jealousy because of my professional accomplishments.

47.     After my first FOS, I requested a special board due to incorrect data on a fitness report regarding my weight and a physical fitness test that had been administratively corrected. My request for a special board was denied.

CH Demy was selected for involuntarily retirement by the FY08 Commander Selective Early Retirement ("SER") Board and retired in June 2008. The retaliation and hostility documented here injured CH Demy by denying him promotion to CAPT, facilitating his selection for SER, and conveying a message of second-class citizenship based on his faith and both military and ministry skills.

h.      JOSEPH DUFOUR (Gibson) resides at 1755 Campbell Rd, Waxahachie, TX 75167-8036. He entered active duty September 21, 1992, endorsed by the Bible Churches Chaplaincy, a Non-liturgical faith group. CH Dufour had a successful and productive career prior to his assignment to the Naval Support Activity at Naples, Italy (Naples) as evidenced by his fitness reports and his promotion to LCDR. He is one of several named plaintiffs who have been victimized by the Navy's oppressive culture of prejudice against Non-liturgical chaplains and faith groups that became a pattern and practice of bias at Naples, orchestrated by its RC command chaplains. For example, no evangelical chaplain who has served under his Catholic command chaplain at Naples, CH (CAPT) Rock, has ever been subsequently promoted on active duty. This systematic prejudice at Naples has resulted in a consistent pattern of threats, harassment, and professional and personal attacks resulting in biased fitness reports designed to destroy his opportunities for promotion and a Navy career.

CH Dufour challenged CH Rock over his prejudice and bias toward the Non-liturgical chaplains, congregations and their programs at Naples. In retaliation, on information and belief, CH Rock contacted CH Dufour's Catholic command chaplain on the NIMITZ, a Boston priest like CH Rock. His new command chaplain undermined CH Dufour's ministry and career and ensured CH Dufour's FOS to CDR. CH Dufour retired after successive FOS.

i.      ALAN GARNER (Gibson) resides at 9844 Rosemont Ave. Lone Tree, Co. 80124.

31

He was a Chaplain Candidate Officer from January 1989 to April 1992 when he entered active duty as a Navy chaplain. He is an ordained Independent Baptist minister and endorsed by the Bible Churches Chaplaincy.

After an initial assignment aboard the guided missile cruiser USS LEAHY, CH Garner was assigned to the Naval Medical Center San Diego, CA. There LT Garner covered more hospital wards than any other chaplain on staff, facilitated two support groups, and helped train hospital staff in patient pastoral care. He was handpicked to deploy with a Navy Fleet Hospital for six months as part of the United Nations Protection Forces. He served as Division Officer over nine enlisted Religious Program Specialists ("RPs") and successfully prepared his department for a major inspection. CH Garner was recognized for his excellent performance with outstanding fitness reports until the new Catholic command chaplain, CH (CAPT) David Young, reported to the Medical Center six months before LT Garner was scheduled to leave. In CH Garner's final Medical Center fitness report, CAPT Young deliberately ignored LT Garner's outstanding performance and accomplishments, downgraded him in the areas of professional expertise and teamwork, and placed LT Garner in the "must promote" category, a significant reduction from his previous rating of "early promote." CH Young never offered any explanation for the poor marks or the lower promotion recommendation. Compared with his previous outstanding fitness reports, CH Young's evaluation cast CH Garner's performance in a bad light.

At the same time CH Young downgraded CH Garner's performance, the Medical Center recommended CH Garner be given the Navy Commendation Medal for his outstanding performance in actions that occurred during the same time frame in which CAPT Young found CH Garner's performance deficient. While CH Young was savaging CH Garner's career, the Medical Center was thanking and rewarding him for the same performance of duty. CH Young's

evaluations resulted in CH Garner's FOS to LCDR, a fact acknowledged by the Bureau of

Personnel ("LT Garner's fitness reports for the period 1 February 1996 to 20 July 1996 display a

negative trend in performance and severely impacted the competitiveness of his record."). CH

Garner was forced to leave active duty, but was subsequently promoted to LCDR in the Naval

Reserve and served in Iraq when his reserve unit was activated. He retired in the Naval Reserve

in January 2009.

CAPT Young was the subject of several investigations, including findings of retaliation

against other evangelical chaplains, racial discrimination against the department's secretary, and

sexual harassment from a junior female chaplain. Evidence in Chaplaincy demonstrates he

favored Catholic chaplains in his ratings while trashing the careers of dedicated and productive

Non-liturgical chaplains.

j.      JOHN GORDY (Gibson) lives at 516 Sage Rd. North, White House, TN. He

began his military career as an enlisted man in the U.S. Marine Corps from January 1978 to

December 1981. He then attended college and seminary and was commissioned as an Ensign in

the CHC in 1987 as a Chaplain Candidate. He entered active duty in August 1988, endorsed by

the Church of God, Cleveland, Tennessee. He compiled an excellent record and was promoted to

LCDR in September 1998. He was selected for and successfully completed postgraduate school

where he wrote a paper addressing how to heal fractured congregations. That article resulted in

his selection for assignment to NSA Naples, where disagreements between the Catholic

command chaplain, CAPT Ronald Buchmiller, and junior Protestant evangelical chaplains had

fractured the community and resulted in media coverage critical of the Navy and the CHC.

On arrival at Naples, CH Buckmiller told CH Gordy, "You know I have a reputation for

ruining evangelical careers." CH Buchmiller is the same command chaplain who ended the

careers of several other Non-liturgical chaplains assigned to Naples. CH Buchmiller then
proceeded to rate CH Gordy in a manner that ruined his career, guaranteeing CH Gordy would be
FOS to CDR. CH Gordy's failure to be selected despite his outstanding performance, as
indicated by his record prior to Naples, his promotion to LCDR and selection for postgraduate
school, is due to the CHC's tolerance of known career killers like CH Buchmiller whose history
indicated he retaliated against chaplains because of their faith and ethnic background, see LCDR
Torralva below.

      At his 2003 deposition in Naples, Italy, CH Gordy testified that when he first heard of the
Adair and CFGC lawsuits and allegations about denominational prejudice, he dismissed their
claims. However, his assignment at Naples changed his view after he was confronted by CAPT
Buchmiller's anti-evangelical prejudice and hostility, and the CHC's and Navy's willingness to
condone his retaliation, prejudice and hostility rather than address it decisively.

      RC CH Rock, Buckmiller's successor, was also prejudiced and exhibited open hostility to
CH Gordy and retaliated against him because of his faith and Pentecostal practices. CH Gordy
retired due to his FOS. He was injured by RC Chaplains Rock and Buckmiller who destroyed his
career and continually conveyed a message of second-class citizenship because of his fulfillment
of his duties as a representative of a Pentecostal, Non-liturgical faith.

      CH Gordy has served as a recorder on CHC promotion boards and testified if released
from his oath of secrecy he has evidence highly relevant to the issue of denominational neutrality
in promotion board proceedings.

      k.     FURNISS HARKNESS (Adair) is a Non-liturgical Navy Reserve chaplain
residing at 400 Green Acres, Memphis, TN 38117. He entered active duty in March 1987 under
the endorsement of the Non-liturgical Christian Church (Disciples of Christ). Although he had

outstanding fitness reports, he found the Navy had two systems, one for Liturgical chaplains and one for Non-liturgical chaplains. After unsuccessfully attempting to obtain the same information concerning assignments after graduate school routinely provided to Liturgical chaplains, he realized his efforts to obtain equal treatment by filing an Inspector General complaint had effectively ended his Navy active duty career

He left active duty in June 1995 and attempted to return to his Reserve status. In an illegal act of retaliation, the Navy CHC issued a new instruction requiring the CHC's approval of his Reserve affiliation in an illegal attempt to deny it. CH Harkness asked the Navy Inspector General (NIG) to investigate the legality of that attempt. The NIG subsequently found the CHC's actions and its "new policy" to be without authority, vindicating CH Harkness's position. The report admonished several senior chaplains for retaliation. The CHC's retaliation and discrimination, based on religious prejudice and hostility to CH Harkness for challenging denominational preferences and the CHC's open preference for Liturgical chaplains, precluded CH Harkness from drilling for a year and a half.

As an further act of retaliation, the Navy failed to select CH Harkness to the grade of Commander in mid-2000, despite his outstanding record and his graduation from the Naval War College. One of the board members on his selection board was implicated in his prior successful NIG retaliation complaint and demonstrated open hostility to Harkness. The obvious reasons for his non-selection was his prior successful complaint to the NIG concerning the CHC's illegal attempt to deny him Reserve affiliation, his participation in <u>Adair</u>, and his attempts to obtain equality of treatment. These retaliatory acts illegally delayed CH Harkness consideration for CAPT.

The record also demonstrates numerous other subsequent acts of retaliation against CH

Harkness by the CHC and its senior chaplains for challenging their "old boys" network and its preference for Liturgical chaplains and practices.

l.      TOM KLAPPERT (Gibson) resides at 7699 Kuhn Road, Greencastle, PA. He graduated from the Naval Academy in 1973. He served five years in the Marines, rising to the rank of Captain (O-3), and remained in the Reserves from 1978 to 1982 while he attended seminary. He was endorsed by the Bible Churches Chaplaincy, commissioned as a chaplain LTJG in September 1982, and promoted to LT in 1983, LCDR in 1991 and CDR in 1998.

CH Klappert was assigned to Marine Corps Headquarters, Quantico, Virginia, from June 1992 to June 1995. CH Klappert became a central figure in the investigation of the Quantico command chaplain for serious misconduct resulting in the command chaplain's relief for cause. CH Klappert also became embroiled in a conflict between the Liturgical senior chaplains and the Non-liturgical junior chaplains who were doing most of the ministry. General Krulak, Quantico's Commander and the USMC Deputy Commandant, placed Non-liturgical chaplains in leadership positions and supported the evangelical ministry and services which found great support in the military community. This caused resentment among the senior Liturgical chaplains at Quantico as well as others in the CHC leadership, who resented the fact the liturgical command chaplain was caught and disciplined and Non-liturgical chaplains placed in leadership positions. See Declaration of LCDR Gary Heinke, Exhibit 10.

After Quantico, CH Klappert was assigned to the Portsmouth Naval Yard. There he experienced great difficulty with a female organist-music director who caused division in the congregation and other difficulties. CH Klappert  finally determined to terminate her employment because of the division she was causing in the chapel. Shortly prior to his scheduled rotation date from Portsmouth and before he was able to terminate the organist's employment, she filed a

complaint alleging discrimination and harassment against CH Klappert. She initially obtained an ex parte protective order limiting CH Klappert from contact with her but the judge vacated that order at a subsequent hearing, finding there was no substance in the complainant's allegations and "this is not sexual harassment."

The Navy began an investigation despite the judge's finding. CH Klappert submitted 16 witnesses' names who would verify the falsity of the allegations, but the resulting investigation only interviewed 6, and perverted the testimony of those who had made statements so the meaning was entirely opposite to the witnesses' testimony.

The base commander initially supported CH Klappert and expressed his confidence the investigation would refute the false allegations, but it became apparent to CH Klappert that his commander had been told supporting CH Klappert was not in the base commander's career interests. It became obvious to CH Klappert this situation was retaliation for his involvement in the relief of the Quantico command chaplain, his support of Non-liturgical ministry at Quantico, his career was over, he was not welcome in the CHC, and he was a target because of his previous success. Faced with an expensive and protracted fight should he choose to legally dispute the charges, he submitted his resignation. His discharge was involuntary because it was motivated by retaliation, premised on coercion, and supported by official hostility and a corrupt investigation.

CH Klappert has also served as a recorder on CHC promotion boards. He has testified that if granted relief from his oath of secrecy, he has evidence highly relevant to the question of denominational neutrality on boards and the evidence he would present based on his experience would "set your hair on fire".

m.     ALLEN L. LANCASTER (Gibson) resides at 172 North Liberty Spring Rd., Suffolk, VA 23434. His case represents a prime example of the Navy's unconstitutional

retaliation, hostility and prejudice toward its Non-liturgical chaplains. His allegations here are supported by his Chaplaincy deposition.

CH Lancaster began his naval career in 1957 as an active duty enlisted sailor, serving until 1961 and thereafter in the Naval Reserve until August 1980 (23 years) when he was commissioned as a Navy Chaplain. Endorsed by the Associated Gospel Churches, an evangelical, Non-liturgical faith group, he then spent 21 years as a Navy Chaplain.

His record is truly outstanding career, every fitness report showing grades of "A" for all performance categories and "early promotion" recommendations. He was promoted to LCDR.

Just prior to his first time in the primary zone for selection to CDR, CH Lancaster was selected to attend the Chaplain Advanced Course on the basis of his stellar record, a course normally available only for CDRs or those selected to be CDRs. He was not selected for promotion to CDR in 1991. Because of his strong record, CH Lancaster was assigned to a high visibility position as chaplain on the USS SAIPAN and was selected for promotion to CDR his second time in zone.

Knowing he would be in the zone for CAPT in 1996, CH Lancaster reviewed his official file and found it was missing an outstanding fitness report dated July 1995 from another high visibility position. His rating officer sent a certified true copy of the missing July 1995 report to the Chief of Naval Personal on June 19, 1996. When CH Lancaster again reviewed his official file microfiche to make sure his record was complete, his July 95 fitness report was still missing. In February 1997, CH Lancaster again sent a copy of the July 95 report to the Navy CHC detailer for inclusion in his file. Following his fourth attempt to ensure his file was complete before the Chaplain CAPT selection board met, the detailer's office told CH Lancaster his missing report was in his records. CH Lancaster was not selected for CAPT and then discovered his July 95

fitness report was still missing, despite his four attempts to provide the missing report and the detailer's assurance the record was complete.

Whether the board actually reviewed CH Lancaster's record is in question. The promotion board's senior recorder's duty is to notify a chaplain's command if a record before the promotion board is incomplete. After the board, CH Lancaster asked the CAPT selection board's senior recorder if his record was complete. CH Epperson replied all the records were complete but a review of his record showed the July 95 report was still missing. CH Lancaster's unit reported it had received no communication from the CHC indicating his record was not complete during the time the promotion board met. Several weeks later, he contacted board member CAPT (later RADM) Barry Black who said, "I do not recall anyone not considered due to a missing report." How could the board have reviewed CH Lancaster's record if all the records before the board were complete, none were reported missing, yet his record was missing an important fitrep?

En route to his new assignment to Camp Lejeune, NC in November 1997 CH Lancaster stopped in Washington D.C. to again attempt to complete his record. He was introduced to LCDR Burdec, Naval Personnel Officer Records Section, who took the report and said, "I will personally ensure that it gets in your file." However, when the next Chaplain CAPT board convened in May 1998, it notified CH Lancaster's unit his official record still lacked the July 1995 fitness report. Deployed with the Marines at the Twenty-Nine Palms, CA, Training Center, CH Lancaster called Camp Lejeune. CH (CDR) Cash forwarded the missing report to the board by fax (January 1997). The July 95 report still did not reach his official record, a fact the BCNR noted in denying CH Lancaster's subsequent request for a new promotion board. The Navy retired CH Lancaster as a CDR October 31, 2001 after 44 years of Naval service.

Overt and deliberate retaliation against CH Lancaster, symbolic of the prejudice against Non-liturgical Chaplains and their faith groups, is the only explanation for the consistent failure of seven documented attempts to get an important, exceptional fitness report into CH Lancaster's record. CH Lancaster's saga demonstrates a pattern and practice of retaliation and sabotage against outstanding Non-liturgical chaplains so liturgically dominated Chaplain boards had an excuse for denying Non-liturgical chaplains a fair opportunity for promotion, thereby maintaining Liturgical domination of the CHC. CDR Demy's declaration, ¶ 35, provides further evidence the ease in which important documents can be removed from chaplains' files on the order of senior chaplains.

n.      MICHALE LAVELLE (Adair) resides at 13921 East Poelstra Street, Vail, AZ 85641.  Despite an outstanding career as a Non-liturgical Navy chaplain including participation in Operation Desert Storm and a preponderance of duty with the Marines, he was passed over for Commander in FY 1998. That required him to face the reality that few, if any, chaplains are subsequently selected once they have been non-selected, Liturgical chaplains seemed to dominate the boards, and a former liturgical supervisor who tried to sabotage and destroy his ministry in Desert Shield/Storm claimed credit for CH Lavelle's FOS, see below, implying CH Lavelle had an overt enemy with connections to senior chaplains and/or board members. CH Lavelle applied for early retirement under the Temporary Early Retirement Act (TERA) to avoid further humiliation, prejudice and the possible financial injury he and his family might suffer if he continued to remain on active duty. He retired on October 1, 1998, and claims he was constructively discharged as a result of his retaliatory and illegal FOS which created a hostile environment and threatened his family, career, and retirement.

Before and during Desert Shield/Storm, then liturgical chaplain LCDR Richard Pusateri

40

was assigned as CH Lavelle's supervisory chaplain with Marine Air Group-13 and CH Lavelle deployed with 2nd LAAM BN (as they had no chaplain and the whole BN had orders to deploy). CH Pusateri covertly attempted to destroy CH Lavelle's ministry, reputation and standing in his battalion by spreading falsehoods, innuendo and lies masquerading as rumors. Since CH Lavelle was new to the unit, he had no history to fall back upon to refute these rumors. CH Pusateri has a history of destroying evangelical careers using that same pattern and practice. CH Lavelle exposed CH Pusateri's efforts and was successful in transferring to another unit (from MAG-13 to MAG-16), as directed by the senior 3rd Marine Air Wing chaplain, who was the direct superior of Chaplain Pusateri and who removed CH Lavelle from CH Pusateri's reach. Even tainted with a transfer at a most unfortunate time (in the middle of a military conflict), CH Lavelle was able to obtain an outstanding fitness report indicative of his ability and skills.

Years later (1994-95) and right before the selection board, while stationed at 3rd Light Armored BN, the senior supervisory chaplain (who was friends with and came from Pusateri's faith group) informed CH Lavelle that CH Pusateri claimed to have the ability to make sure that CH Lavelle would FOS to CDR. CH Lavelle had an outstanding reputation at this duty station and was well respected by this supervisory chaplain. This story indicates that CH Pusateri had contacted someone on the CDR promotion board who zeroed out CH Lavelle in retaliation on CH Pusateri's behalf. In fact, one of the board members shared a domination with CH Pusateri.

The DODIG investigation of the FY 97-98 CHC CDR produced evidence the board had illegally used faith group as a promotion criterium and promoted Liturgical chaplains with records inferior to those not selected, including CH Lavelle. The Navy's failure to address its chaplain promotion system allowing one chaplain board member to anonymously destroy a chaplain's career with no accountability and its other legal problem provided a well-known

41

avenue of illegal retaliation and denominational preference. The Navy's faith group prejudice and the realities of the Navy's promotion and separation policies constitute a constructive discharge.

o.      GEORGE W. LINZEY (Adair) resides at 1111 Seacoast Drive #61, Imperial Beach, CA 91932. He was endorsed by the non-denominational National Association of Evangelicals, commissioned as a chaplain in the Naval Reserve in April 1975 and entered active duty as a Navy chaplain on September 6, 1975. CH Linzey was the youngest chaplain to make Captain but the FY 1998 SERB selected him for involuntary early retirement despite his outstanding record.

In the spring of 1997, RADM Koeneman, a former Chief of Chaplains, made a special trip to visit CH Linzey at Great Lakes Naval Training Center (the "Center") where CH Linzey was the Command Chaplain. RADM Koeneman told CH Linzey to "get your resume ready", it was time for him to return to civilian life, and gave him the name and contacts of a church looking for a music minister. CH Linzey was selected for SER in January 1998 as predicted.

RADM Koeneman's warning and advice is evidence CH Linzey was personally pre-selected by the Chief rather than by an unbiased SER board based on an objective records review. CH Linzey's father was the first Navy Assembly of God chaplain to be promoted to CAPT. He warned George about the CHC's bias against Non-liturgicals and told him he would have to work harder than the other chaplains. His success aroused jealousy amongst other senior chaplains.

CH Linzey attempted to correct the CHC's Non-liturgical bias when he encountered it and change the CHC's culture. As the Center's Command Chaplain, CH Linzey exposed and helped correct an injustice to a CFGC endorsed chaplain, LT Patrick Sturm. LT Sturm's former supervisory chaplain torpedoed CH Sturm's career with a mediocre/poor fitness report through the use of code-words while telling CH Sturm the report was a good one and the code-words

were good for him. CH Linzey helped LT Sturm expose the former command chaplain's

duplicity and the CHC's hostility to Pentecostal and charismatic chaplains.[8]

CH Lindsay compounded his offense against the CHC's Liturgical leadership by rating

LT Sturm above an RC LT chaplain.

CH Linzey believes his preselection for early retirement retaliation was based on (1) his

efforts to correct injustices against Non-liturgicals, e.g., LT Sturm, (2) his efforts to challenge

and change the CHC's "good old boys" liturgical network, and (3) denominational reasons,

rather than an objective review of his record compared with other eligible chaplains.[9] The

president of his SER Board was the Chief, four of the five SER CAPT selectees were Non-

liturgical.

p.        JAMES LOOBY (Gibson) resides at 1713 County Rd. 318, Early, TX. He began

his military career with the U.S. Air Force in June 1967 and served there until June 1971. He

completed seminary in 1975 and entered the CHC in February 1984 endorsed by the SBC.

He served in a variety of assignments and was promoted to LCDR in April 1991 and

subsequently to CDR by the FY96 promotion board but was not selected by the FY03 CAPT

board. He subsequently learned a rumor was circulating among the CHC leadership that CDR

Looby had been injured on active duty, was ineligible for promotion and had performance

---

[8]. The Navy and CHC's treatment of LT Sturm in opposition to his efforts to correct his prejudicial, erroneous fitrep resulted in a 1999 lawsuit challenging his non-selection to LCDR.

[9] The Navy kept Naval reservists on active duty who should have been separated in compliance with Secretary of Navy Instructions implementing Title 10's emphasis on maintaining an all Regular Navy. A 10/24/1994 CHC Community Manager memo warned the Chief SERs would be necessary to maintain the CHC's "denominational balance" if certain steps were not taken, clearly an illegal motive for SER since selections, like promotions, must be based on merit,  not denomination.

problems. On information and belief, this view was shared by RADM Iasiello, the president of

his first CAPT board, in retaliation against CH Looby. There is no other explanations for his FOS

given his record except the board reliance on RADM Iasiello's unfounded and malicious rumor

contrary to his record or retaliation by being "zeroed out." CH Looby retired in 2005, in effect a

constructive discharge. Like all the other chaplain plaintiffs, CH Looby was injured by being

denied promotion as a means of unjust retaliation and the message of second or third class

citizenship communicated by the CHC's and Navy's twin messages of denominational

preference and prejudice.

q.     WALKER MARSH, JR. (Gibson) resides at 125 Whisperwood Blvd., Slidell, LA.

He was  endorsed by the SBC, commissioned as a Navy chaplain in October 1982, entered active

duty in January 1984 and promoted to LCDR in November 1990.

In September 1985, he was assigned to the Naval Training Station, San Diego, CA. The

Liturgical command chaplain, CH Dempsey, told CH Marsh in his initial interview: "I hope that

you're not planning on making this a career because you already have three strikes against you.

You are the wrong sex, the wrong color and the wrong religion." This was a prophetic utterance.

CH Marsh began an alternative Non-liturgical worship service with two other Non-liturgical

chaplains, LTs, Michael Lavelle and Robert Yourek after he arrived at the Naval Training

Station. Despite being restricted by the command chaplain to an unreasonable time (7:00 am) and

still being required to participate in the Liturgical General Protestant service, under CH Marsh's

leadership the Non-liturgical service soon grew to approximately 60 attendees. At this point, the

command chaplain terminated the service.

CH Marsh was assigned to the U.S. Marine Corps School of Infantry, Camp Pendelton,

CA after selection for and completion of postgraduate school. The base's Liturgical command

chaplain, CH Ha, established a chaplain meeting schedule and other procedures for the chaplains he "supervised" that created direct conflicts between his demands on their time and the time and priority requirements of the unit commanders to whom the chaplains were assigned and who rated them. CH Ha did not address the resulting conflict he had created with the unit commanders themselves but demanded his junior chaplains convince their commanders that he was the appropriate authority to determine the responsibilities and priorities for the battalion chaplains, rather than the battalion commanders. CH Marsh rightfully objected to this as a breach of discipline and custom.

CH Ha promised CH Marsh he would make sure CH Marsh would never be promoted. CH Ha made it clear to CH Marsh Liturgical chaplains controlled the chaplain promotion boards and used that control and its threat to chaplains' careers to keep Non-liturgical chaplains in line. This control kept junior chaplains subservient to senior chaplains rather than their unit commanders to whom the junior chaplains were assigned and accountable for ministry. This is another example of the well known CHC's truism, "the line may rate you, but the CHC promotes you." The fact CH Marsh was FOS despite his outstanding record gave support to CH Ha's claim he would destroy CH Marsh's career in retaliation for obeying his commander's instructions and meeting his unit's ministry needs.

CH Marsh's assignment to the USS BELLEAU WOOD after his first FOS to CDR exemplified the CHC's retaliation, deceit and religious prejudice against CH Marsh. His detailer, a member of the board that had not selected CH Marsh for CDR, said CH Marsh needed an unaccompanied tour (i.e., no family) to better his chance for selection by the next promotion board because the BELLEAU WOOD assignment would be a supervisory position. When CH Marsh questioned the detailer about his first FOS and the fact that the next board results were not

45

yet known, his detailer said, "Don't you know you'll get picked up?" When he reported to the ship, he discovered he was not assigned to a supervisory position.

After his second FOS while on the BELLEAU WOOD, the CHC told him the Navy would separate him under 10 U.S.C. § 632 and then gave him a series of changing return and separation dates that resulted in a two year involuntary, extended, unaccompanied tour. He spent two years separated from his family as a result of CHC deceit, religious hostility and retaliation for exercising his duty to represent his endorser and serve his commander. This is not the type of service or treatment given to Liturgical chaplains.[10]

     r.     DENISE Y. MERRITT (CFGC), endorsed by CFGC, entered active duty in the CHC in February 1990 with prior enlisted service in the U.S. Marine Corps. She was first stationed at Charleston, SC, then Quantico, VA, and finally the National Naval Medical Center in Bethesda, MD. The Navy subjected her to prejudice and retaliation because of her endorsement by CFGC.

CH Merritt's Liturgical supervisor undermined all her ministry efforts at Quantico. For example, after scheduling an inter-service chapel concert with Army and Air Force bases in neighboring states, her command chaplain told her to cancel it at the last minute. Also during her time at Quantico, she became embroiled in a conflict between the Liturgical and Non-liturgical chaplains over the type and quality of ministry and turmoil surrounding the relief of the Liturgical command chaplain.

CH Merritt's fitness reports at Bethesda cited shortcomings provided by her Liturgical

---

[10] CH Dufour reports his RC command chaplain, CH Jerome Dillon, had been reassigned several times before his tour of duty was complete and assigned as command chaplain on several other ships in an apparent effort to boost his record and career.

command chaplain, Jane Viera, for which CH Merritt had received no prior notice or counseling. Her efforts to correct or challenge the ratings were ignored or rebuffed. CH Merritt served on twelve hospital committees and performed eight collateral duties at Bethesda. This contrasted with a Catholic chaplain at the same rank who served on no committees and performed no collateral duties because he did not speak English well, yet CH Vieira rated the Catholic chaplain above CH Merritt. Evidence shows CH Jane Viera did not like Non-liturgicals and left a wake of ruined evangelical chaplain careers wherever she was assigned.

CH Merritt left the Navy in May 1998 after her FOS for LCDR and was commissioned as an Army chaplain assigned to Ft. Eustis, VA when CFGC filed its suit and joined as a plaintiff. She was promoted to Major as an Army chaplain and was selected for and completed postgraduate school. CH Merritt retired after completing 20 years of service but was offered and accepted the opportunity to return to active duty. She has retired for the second time and lives at 4405 Biway Cir., Fayetteville, NC 28311.

CH Merritt's injuries include being denied a fair opportunity to compete for a full career and promotions in the Navy, denial of promotion to LCDR in the Navy and the opportunity to compete for other promotions, and delay in being promoted to O-4 in the Army because she had to essentially restart her military chaplain career. The CHC placed CH Merritt under abusive and hostile chaplain supervisors who retaliated against her on the basis of her faith and inflicted great stress and strain on her and her family.

CH Merritt was an assistant board recorder for the FY 96 CHC Commander promotion board. She testified she has relevant and material evidence addressing the influence and conduct of the Board President, denominational preferences, and other issues addressing denominational considerations discussed during the board if she is released from her oath of secrecy concerning

47

the proceedings.

s.    DAVID MITCHELL (Gibson). Dr. Mitchell resides in Durham, NC.  He was
endorsed by the Progressive National Baptist Convention, a Non-liturgical denomination, entered
the Navy CHC in Sept. 1987 with 4 years prior service in the USAF. He had completed his work
for his PhD and had held 3 supervisory billets in which he had received outstanding fitness
reports when he entered the primary zone for promotion to CDR in 2001. He was not selected for
CDR despite his outstanding record and career.

The president of the CDR promotion board was RADM Iasiello, then the director of the
Chaplain School. He had supported a female chaplain candidate's unsupported and false
allegation that Dr. Mitchell had sexually harassed her during an interview required for the
chaplain commissioning program. The subsequent investigation proved his innocence, but CAPT
Iasiello (who later became Chief) indicated to Dr. Mitchell he believed the candidate's
allegations and would find a way to end Dr. Mitchell's career. The 2001 CDR Board with
RADM Iasiello as president, denied Dr. Mitchell's promotion but selected two Catholic
chaplains above zone who did not have records as strong as Dr. Mitchell's.

Consideration of factors other than the record is improper, forbidden by the Secretary of
Navy's instructions, Equal Opportunity regulations and the Equal Protection component of the
Fifth Amendment. Dr. Mitchell believes the Navy's secret voting process and small boards allow
one chaplain board member to prevent a candidate's selection by voting "zero" with no
accountability, presenting a dishonest briefing of the candidate's record, and allowing comments
not in the record during discussion. Dr. Mitchell believes this process allowed RADM Iasiello to
retaliate against him by preventing his promotion and ending his career. Dr. Mitchell retired in
2003, after two FOS to CDR.

48

t.      JAIRO MORENO (Gibson) resides at 2009 Oak Brook Dr., Portland, TX. He
entered the Navy Chaplain Corps in 1987 endorsed by the Church of God of Cleveland,
Tennessee, a Pentecostal Non-liturgical denomination. CH Moreno is Hispanic, and the
combination of being Pentecostal and Hispanic resulted in retaliation, bias and prejudice
throughout his chaplain career.

He was assigned to work under CAPT Rock, the Catholic command chaplain, in
Okinawa. CH Rock expressed his view CH Moreno should have been Catholic rather than
Pentecostal because he was Hispanic and retaliated against him accordingly. CH Rock subjected
CH Moreno to a series of degrading and insulting incidents and gave CH Moreno fitness reports
that made him non-competitive for CDR. CH Moreno suffered numerous FOS to CDR. No
Pentecostal chaplain who worked for CAPT Rock has been promoted.

The command chaplain who followed CH Rock was CH Lesak, another Catholic. On
arrival, CH Lesak told CH Moreno, "I don't want anything to do with you because you have been
passed over" and treated CH Moreno with disrespect and disdain.

 The command chaplain who followed CH Lesak gave CH Moreno increased
responsibilities and outstanding fitness reports, although nothing had changed in CH Moreno's
approach to ministry. CH Moreno's FOS was due in large part to the animosity of his former RC
command chaplains, who savaged his career with prejudiced fitreps. This was aggravated by the
policy of always having a RC on every promotion board until FY 2003. CH Moreno was
considered for promotion to CDR during that time. CH Moreno is one of two plaintiff chaplains
with Hispanic ethnicity. Non-liturgical Hispanic chaplains were not promoted while Catholic
Hispanic chaplains were.

u.      RENE PORTER-STEWART (Gibson). CH Porter-Stewart was an active duty

49

Navy Chaplain assigned to the Naval Medical Center, San Diego, California, until she was discharged March 1, 2006, for multiple FOS to LCDR, She currently lives at 2028 Farmdale Lane, Spearfish, S.D. 57783.

CH Porter-Stewart entered active duty as a Navy chaplain in September 1988, endorsed by the International Church of the Foursquare Gospel, an evangelical, pentecostal, Non-liturgical faith group. CH Porter-Stewart's career is filled with examples of the Navy's overt and covert retaliation and hostility to effective, Non-liturgical chaplains, and retaliation for the exercise of her Pentecostal faith. During Operation Desert Shield and Desert Storm (Persian Gulf War), she established an airport ministry at Cherry Point, NC for all Marines leaving or coming home. She also developed and hosted several episodes of a television program for the Cherry Point, NC military community addressing such topics as reunion (when a service person returns after a deployment and combat) and suicide prevention. Despite these highly effective programs, she experienced hostility from her command chaplains who recommended she be given low marks on her fitness report. Her commander disregarded her command chaplain's career harming recommendations, writing higher and more accurate fitness reports on her.

CH Porter-Stewart's command chaplain reassigned her from her highly effective Headquarters Squadron ministry, placed in a closet for an office and gave her no job description, no budget, and no religious program support personnel. Several months later, after she defined her duties and began building an effective ministry, she was placed in a CDR's position as a LT with no overlap or support. The senior Second Marine Air Wing Chaplain subjected her to hostility, inappropriate language and harassment.

She was assigned to Balboa Naval Hospital, aka the Naval Medical Center, San Diego, CA, in 1995-1997, and again faced great harassment, a hostile work environment and retaliation

50

from the RC command chaplain, CAPT Dave Young. CH Porter-Stewart, another female (LT) chaplain, two male chaplains and the Command Chaplain's civilian secretary filed complaints against CAPT Young.

The Navy placed CH Young on CH Porter-Stewart's LCDR Chaplain Selection Board, which failed to select her. The Board of Corrections removed CH Young's fitness reports on CH Porter-Stewart, but did not grant her a special board.

No active duty Non-liturgical chaplain who worked under CH Young was promoted. CH Young rated his Catholic chaplains above Protestant chaplains, both Liturgical and Non-liturgical, not on the basis of performance but because they were Catholic. See also claims of Belt, Garner, and Roysden who also suffered retaliation under CH Young.

v.      RAFAEL J. QUILES (Adair).  Rafael J. Quiles resides at 203 Orchard Grove Place, Oldsmar, FL 34677. CH Quiles had prior enlisted service in 1970-1972 and 1973-1977. He reentered the Navy as a chaplain in January 1984, endorsed by the Church of God, Cleveland, TN, a Pentecostal denomination. He reached the rank of LCDR. CH Quiles' career and his exemplary record should have qualified him for promotion to Commander. He was non-selected for promotion to Commander by the FY 1997 and 1998 chaplain promotion boards.

The evidence from the Navy and DOD Inspector General investigations clearly shows (1) faith group played a determining part in the selection of chaplains for promotion during those boards, and (2) chaplains with records inferior to CH Quiles were selected for promotion while he was not. The reason he was not promoted was because he was a Non-liturgical and a member of a disfavored faith group, whereas those with inferior records who were promoted were from favored Liturgical faith groups. After his non-selection, CH Quiles was told to leave the Navy. His retirement in December 1998 following his second FOS was a constructive discharge.

At first, CH Quiles thought his non-selection was "the luck of the draw." Through one of the co-Plaintiffs, he learned of the Stafford Report and by comparing his record objectively with those who had been promoted, he knew his FOS was not based on his record but other factors, including retaliation. Liturgical chaplain CAPT George Cooper was a board member on the FY 97 board. He had been CH Quiles senior chaplain previously, during which time CH Quiles confronted CAPT Cooper over what appeared to be an illegal practice. CAPT Cooper remained hostile to CH Quiles and should have recused himself from the board. CH Quiles believes CAPT Cooper zeroed him out in retaliation for CH Quiles' confrontation over CAPT Cooper's wrongdoing.

CH Quiles' improper FOS resulted in an illegal and constructive discharge.

w.    DANIEL ROYSDEN (CFGC) was an active duty Navy Chaplain. His August 4-5, 2000 board deposition captures many of the CHC's incidents of retaliation against him. CH Roysden joined the chaplain candidate program in 1981, was initially commissioned as a chaplain endorsed by the United Methodist Church and accessed into the Navy reserve. Roysden Deposition [28:1-21]. He had numerous assignments as a Naval Reserve chaplain filling short-term recalls for active duty. He had good reports and a good reputation.

Before coming to active duty, CH Roysden changed his endorsement from United Methodist to CFGC. His detailer warned him against changing endorsements from the Liturgical United Methodist to the Non-liturgical CFGC:

> When he found out I was switching from United Methodist to CFGC his statement was, "You just signed your death sentence." He said, "If you had switched from Non-liturgical to Liturgical, you'd probably be okay." He said, "In fact, I had done that"-himself-but he said, "by switching the opposite way, it will be very difficult for you in the future."

[51:5-12].

Roysden's first assignment as an active duty chaplain was to a ship stationed in Japan. Just before his first deployment, the SURPAC senior chaplain, CAPT O'Donnell, visited Roysden's ship and requested an interview with the Captain without telling Roysden the specific purpose. The Captain later informed him CAPT O'Donnell had warned the CO "do not be surprised if we have to relieve [Roysden] for cause. He's from a church group that has no good track record, they're a brand-new denomination." [79:4-25]. His captain gave CH Roysden outstanding fitness reports.

Other Navy chaplains told CH Roysden he had made a mistake changing his endorsement from Methodist to CFGC and that it would hurt his career if he did not get out of "that group."

CH Roysden's next duty station was Naval Station Pearl Harbor. He found a place for a charismatic group to meet when the command chaplain, CAPT Craycraft, would not permit them to use the chapel for services. CH Craycraft told CH Roysden, "[p]eople like them, people who were Pentecostal Charismatics not only had no business holding worship on naval property, they had no business being in the Navy", knowing CFGC endorsed CH Roysden. [139:2-7].

His command chaplain at Balboa Medical Center, San Diego, CA was RC CAPT Dave Young. A female chaplain, Fran Stuart, reported to Roysden CH Young was sexually harassing her. She filed a complaint and CH Young attacked Roysden and removed him from his responsibilities in administration and as his number two person when Young was gone. When told he could not do that, CH Young said, "I can do whatever I want. You betrayed me by not telling me that Fran Stewart was going to file a sexual harassment complaint against me" [189:25-190:10]. CH Roysden was obligated not to reveal CH Stuart's information and claims.

When Roysden complained of CH Young's retaliation, the JAG and the EEO at the San Diego Medical center "filed it illegally, as I understand it now, under Fran Stewart's sexual

harassment complaint." [127:7-12].

The EO investigation found Roysden's removal "as the administrative second-in-command had the appearance of retaliation. And [CH Young] was directed to reinstate me to all the responsibilities I had before his removal of me from those responsibilities, and he refused to comply with that directive." [128:25-129:10].

Roysden points out numerous deficiencies in the resulting investigations of both Stewart and his complaints suggesting official interference to protect CH Young. Roysden's whistleblower complaint, which should have been handled by the JAG, was sent to the Equal Opportunity office for investigation along with CH Stewart's complaint but he was not given an "advocate", a requirement under the EEO regulations. [191:7-25].

CH Young barred Roysden from "any official part of the office", refused to talk to him, and tried to have him reassigned to an isolated post in Puerto Rico on short notice, contrary to regulations. The Catholic Junior detailer told Roysden that he would take the orders despite regulations which precluded this assignment. Roysden called Mrs. Berto at the Chief's office. She informed the detailer the reassignment was improper and canceled the orders. [192:2-194:10].

When CH Roysden returned from the Korean Air Crash Disaster on Guam, Young told him not to discuss anything about what happened, what he saw, and the ministry with any others, greatly increasing Roysden's PTSD. "I want you to shut up about this crap. You're not allowed to talk to anybody else about this" [207:1-2].

CH Young also attempted to degrade Roysden's performance by failing to address his significant participation in the Korean Airlines crash where he "had done more debriefings than anyone else on the team" and played a significant role in the post crash operations and memorial

ceremonies. [195:17-196:19].

Young favored Catholics who did not like evangelicals and always gave them the highest ranking, [34:6-7], but acted with prejudice to those who did a good job in their ministry, cooperated with other chaplains and/or objected to his high-handed prejudice. CH Young retaliated against any priest or anyone else who objected to his decisions while being very favorable to his fellow priests that just toed his party line. CH Young gave RC CH D'Auarora the lowest ranking, [234:8-13], despite "doing more work than most of the other lieutenants." [235:7-12]; he was given the "early promote" and the number one ranking <u>after</u> CH Young left.

CH Young moved Catholic CH Dombrowski early because he challenged CH Young's ranking him above CH Paul. [235:20-to 36:17]. Dombrowski was "highly respected throughout the hospital and a person who was open to friendship and ministry to anyone of any faith background." [238:7-18].

CH Young moved RC CH Klarer early so he would not have to compete against the other LCDRs under a new command chaplain. [237:1-11]. CH Young ranked CH Livingood, who was not liked on the wards or by staff, the number one Lieutenant among six. "CH Livingood, was ranked dead last." when CH Young left [243:13- 245:24].

CAPT Young had told Roysden "he would make sure that I did not make commander", [85:23-25]; CAPT Young was a personal friend of the Chief, RADM Holderby, because they were roommates in chaplain school and "most of the 0-6's have a connection system and will talk up or talk down certain chaplains." [86:2-12].

> In fact, the person from San Diego that was on that board, after the board met, was in the hospital perhaps a month later and he was meeting the chaplains. The statement he made to me was, "oh, you're CH Roysden." Which, for some reason, I couldn't understand why he would make the statement. Instead of "Oh, it's nice to meet you," his statement was "Oh, you're CH Roysden." [86:16-23].

The BCNR recognized Roysden had been harmed but refused to follow logic or reason in denying his appeal of CH Young's damaging reports. The BCNR said,

> "we recognize the appearance of discrimination, retaliation, and a hostile work environment, but we feel that this in no way impacted your fitness reports and your chances for promotion." [122:12-16]

When Roysden attempted to mentor and train Junior chaplains who had come to the San Diego Middle Center, or attempted to get CH Young to discuss issues with his Junior chaplains who were having troubles, CH Young berated him. [80:13-84: 1]. CH Young said "I will make sure you never make 0-5. You can count on that." [83:25-84:1]. While CH Young would give others "glowing reports" about Roysden, "in my personal encounters with him, he was always this very abusive, I don't like you, you're this way or that way." [84:6-10].

CH Young would get together with the other two Catholic priests and "make policy for the Protestant Chapel". "The three of them would decide on promotion recommendations for their chaplains" [105:12-15], and made decisions affecting ministry, including Protestant worship, without consultations with the Protestant chaplains. [239:22-240:9].

Admiral Diaz, the Medical Center commander, spoke to CH Roysden as he checked out of the hospital and apologized for what happened with the investigation. He said he never dreamed that his biggest problem at the Hospital would be the chaplains' office. He was amazed at what went on. He said, "I couldn't control the investigation [but] could only go on the recommendations", not recommendations he would've made. Admiral Diaz said immediately upon the release of investigation, he, [Diaz] fired CH Young. CH Young was not fired "due to the reported intervention of Young's three-star friend." [281:4-25].

CH Roysden's record was superior to others selected  by the FY 98 board, a fact known because the Stafford Report provided the rankings and scores of those selected. His record, with

the exception of "two Bs as a reservist, all his active duty evaluations were all "As".[72:23-73:9].

CH Roysden requested an investigation of "an improper removal of a fitness report from my records and an attempted cover-up of that removal by the individual who did it [at] BUPERS." That was a special fitness report by Admiral Diaz "documenting my participation in the Hurricane Mitch recovery efforts in Honduras and Nicaragua", a very good report which was removed from his file **before** the FY 2000 board for commander, a fact admitted by Mr. Pool at BUPERS. [288:6-290:9]. The investigation was a farce, like those before it.

CH Roysden's injuries include consistent treatment as a third class citizen by senior chaplains because he was endorsed by CFGC, and because of retaliation and denominational prejudice denial of recognition awards for his outstanding performance, promotion to Commander in the Navy, the opportunity to compete for other promotions, a full career, and promotions in the Navy. The CHC placed CH Roysden under abusive and hostile chaplain supervisors who inflicted great stress and strain on CH Roysden and his family. Senior Navy officers allowed, facilitated and covered-up RC CAPT Young criminal and mental abuse. CH Roysden retired after multiple FOS 2007 and now resides at 305 Sandalin Lane, Peachtree City, GA 30269.

x.    MARY HELEN SPALDING (CFGC) enlisted in the Navy in September 1983, attended and graduated from officer's candidate school in 1986, and transferred into the Navy's Chaplain Corps in August 1990, endorsed by CFGC. She was hand picked as the first woman chaplain to serve on an aircraft carrier after service in the Gulf War and the Parris Island Marine Corps Recruit Depot at Parris Island. She was named Navy Chaplain of the Year in 1995 while at Naval Air Station Key West, FL after service on the aircraft carrier USS Forrestal. At Key West, the CHC then assigned as her command chaplain supervisor a Protestant Liturgical chaplain who had previously demonstrated his inability to get along with female chaplains and other faith

57

groups. Upon his arrival at Key West, he told CH Spalding he could not work with her because she was a woman.

Rather than deal with the Protestant Liturgical command chaplain who created the problem, the Navy then reassigned her in a prejudicial manner that ensured she would not be competitive for selection to Commander. She was transferred to the 2d Marine Division. As a LCDR she was initially given a supervisory position normally assigned to a Commander. That changed when the new Division chaplain took over her responsibility and effectively ruined her career by giving her degraded assignments and fitness reports. The only explanation for that treatment is retaliation and denominational prejudice.

Faced with the prospect of being separated after FOS because of the damaging impact on her career due to her Key West and subsequent experience and assignments, she retired at 15 years under the Temporary Early Retirement Act ("TERA") in October 1998. The Navy's overt and official hostility to her as a CFGC chaplain resulted in her being uncompetitive for promotion, amounting to a constructive discharge. Had it not been for this prejudice, CH Spalding would have been promoted and finished her career as a Navy chaplain. She now resides at 610 Walk the Plank, La Jolla, TX 78560.

CH Spalding's injuries include being treated as a second-class citizen because of her CFGC endorsement, being denied a fair opportunity to compete for a full career and promotions in the Navy, denial of promotion to Commander in the Navy and the opportunity to compete for other promotions. The CHC placed CH Spalding under abusive and hostile chaplain supervisors who retaliated against her based on her religion and her appropriate complaints about denominational preference, inflicting great stress and strain on CH Spalding.

y.      ARMANDO TORRALVA (Gibson) began his military career as a Chaplain

58

Candidate endorsed by the Associated Gospel Churches, and was commissioned a 2LT in the USAF Reserve in August 1981. He was commissioned in the Air Force Chaplain Service, remained in the Air Force Reserve from 1984 to 1988, and was promoted to CAPT (O-3). He then entered the Navy as a chaplain in July 1988.

CH Torralva was chaplain for the Marine 1 Squadron which flies the presidential helicopters during the presidency of George Bush, Sr. In 1997 CH Torralva was selected for postgraduate school and attended Princeton Theological Seminary. The normal chaplain postgraduate education program does not have sufficient hours to qualify for a degree, but CH Torralva took extra hours and earned a Master of Theology degree. Despite the fact the Secretary's instructions require boards to look at postgraduate experience in a positive light, and the fact he was selected for postgraduate school based on the strength of his record, CH Torralva was not selected by the FY99 CDR Board. He was scheduled to fill a CDR's billet at COMFAIRMED Headquarters in Naples, Italy. Although he reminded the detailer that he had been FOS, the detailer reviewed his records and indicated to CH Torralva he had a competitive record and would probably be picked up by the next board.

Reporting to COMFAIRMED in August 1999, CH Torralva discovered his billet was unfunded, meaning it had no financial support, and the billet had been withdrawn from the Headquarters. Nonetheless, he was assigned as a force chaplain, which normally would have meant exercising supervisory responsibilities over subordinate chaplains as a member of the Admiral's staff. CH Torralva did an inspection of a chapel program at Rota, Spain in his role as force chaplain. The command chaplain was Catholic CAPT McLaughlin.

CH Torralva found minor improprieties and problems, including numerous complaints against the junior RC chaplain from his parishioners and staff who complained he was not doing

his job. CH Torralva also found minor discrepancies in the Religious Offering Fund. The report

embarrassed the command, particularly since a Protestant Hispanic pointed out their difficulties.

CH Torralva's senior chaplain, CH (CAPT) Gentolli at CINCUSNAVEUR, the command

chaplain of Naval Forces in Europe, directed CH Torralva to evaluate the problems at the Naval

Support Activity at Naples. CH Torralva found the Religious Ministries Department under the

Roman Catholic CH Ronald Buchmiller was divided, demoralized and dysfunctional due to CH

Buchmiller's lack of leadership and hostility toward Protestant evangelicals. CH Torralva

recommended in a white paper to CH Gentolli that they initiate team building exercises to help

remedy the problem. He was criticized for his inspection and recommendation by both CH

Buchmiller and the NSA Commander, CAPT Gray, who blamed the problems on a previous

chaplain, Phil Veitch, who allegedly stirred up division and dissension. However, CH Veitch had

been gone for some time and an objective evaluation showed the real problem was CH

Buchmiller's anti-evangelical attitudes and prejudice. The Navy then transferred CH Torralva

from COMFAIRMED to NSA Naples, working under CH Buchmiller, the same command

chaplain he had just criticized.

While at COMFAIRMED, CH Torralva assumed the pastorship of a evangelical

congregation of  American military personnel assigned to NATO Headquarters at Armed Forces

South (AFSOUTH). When he was reassigned to NSA Naples, CH Torralva retained his position

as the chaplain/pastor for that congregation. When the new command chaplain, CH (CAPT) Steve

Rock, another Catholic, reported in, his first words to CH Torralva were he wanted the

AFSOUTH congregation disbanded. CH Torralva communicated that to AFSOUTH personnel

who pointed out under Title 10 and the Memorandum of Support among the Armed Forces the

Navy had to provide support for the religious needs of AFSOUTH and therefore CH Rock could

not shut down the evangelical congregation. This became a continuing bone of contention between RC CH Rock who wanted to eliminate the evangelical congregation, and CH Torralva, their pastor.

CH Torralva was supposed to be the deputy command chaplain because of his seniority as a LCDR, but CH Rock refused to allow CH Torralva to function as such. CH Rock made, and permitted others to make, openly disparaging anti-Hispanic comments about CH Torralva.

When the base commander, CAPT Gray, planned to initiate a "teen clinic" which would dispense birth control and provide sexual disease treatment to teenagers without parental consent, CAPT Gray directed the chaplains to help sell the program to the community. CH Torralva preached a sermon on parental responsibility, including their obligation to instruct their children in sexual matters, and mentioned the opening of the Teen Clinic without either criticizing or preaching against it. The sermon caused a firestorm in his congregation, which included high ranking Army and Navy officers, because the program was being imposed without parental involvement or warning. CAPT Gray was embarrassed and accused CH Torralva of violating an order not to discuss the Teen Clinic until such time as the command was ready to announce it to the community. CAPT Gray and CH Rock retaliated against CH Torralva on his fitness reports. A subsequent Article 138 investigation initiated by CH Torralva exonerated CAPT Gray. The investigator was a member of CH Rock's congregation; several of the witnesses claimed the investigator misrepresented their testimony and refused to sign statement or statement summaries. The investigation highlighted the dysfunctional and divisive Chaplain Department under CH Rock but nothing was done.

The promotion rate of Hispanic Protestants is clearly below that of Hispanic Catholics. It is believed this is due to a perception among many Catholic board members Hispanic personnel

should be Catholic, not Protestant or evangelical, a perception flowing from comments made to several Hispanic non-Catholic chaplains, including CH Torralva. The fact that CH Torralva could be selected to be the chaplain for Marine 1 Squadron, postgraduate school, and sent to occupy a CDR's billet while still a LCDR is clearly inconsistent with his FOS. The only explanation is something other than his record influenced the board in retaliation for his beliefs and record. The Navy system of secret votes and small numbers of board members gave unbridled discretion to denominational representatives with historic animosities to denominations such as CH Torralva's.

In summary, the CHC placed CH Torralva under abusive and hostile chaplain supervisors who retaliated against him for defending his congregation and beliefs, and inflicted great stress and strain on him and his family. His injuries include treatment as a second-class citizen, being denied a fair opportunity to compete for Commander, further promotions and a full career in the Navy as a result of the CHC's unlawful retaliation and failure to address remove the tools that allow such retaliation.

CH Torralva retired in Corpus Christi, TX because of multiple FOS. He resides at 6637 LaBianca Dr., Corpus Christie, TX

z.     DAVID S. WILDER (Adair) resides 105 La Salle St., Wilmington, NC 28411. He entered active duty in September 1985 endorsed by the SBC. He was non-selected for Commander in 1999 and 2000 despite an outstanding record but in fulfillment of several Liturgical chaplains who swore they would prevent him from promotion. Those hostile promises are easy to keep due to the Navy's promotion procedures which facilitate retaliation and religious discrimination without accountability.

CH Wilder's many examples of retaliation and religious hostility based on his status and performance as a Non-liturgical chaplain are described in his 12/16/2003 Adair Deposition. The

samples and highlights provided here and in his deposition in no way encompass all of the blatant and obvious incidents of retaliation and faith group prejudice he experienced.

His first senior Liturgical chaplain, CH Ha, improperly expected Wilder, a Southern Baptist, to be able to do a Liturgical service. His command assigned him to pastor the General Protestant service at his base in Okinawa. His General Protestant service with Baptist overtones averaged approximately 100 to 125 per week. In June 1992, Episcopal CH Williams, the incoming Marine Expeditionary Force chaplain who was **not** in Wilder's chain of command, visited CH Wilder's service. CH Williams made "suggestions" to "improve" CH Wilder's service which converted the General Protestant service into an Episcopal service. CH Wilder refused and CH Williams, not in CH Wilder's chain of command, "fired" CH Wilder in front of his family and congregation without prior notice but with the collusion of CH Wilder's own command chaplain, CDR Wilson, who refused to meet with Wilder after his humiliating removal. CH Williams converted it into an Episcopal mass, reducing attendance to about 12 people per week.

CH Wilder subsequently started a Baptist service in the base theater which grew ten times larger than CH Williams' service. CH Williams tried to close CH Wilder's service, claiming sabotage. CH Wilson subsequently unsuccessfully attempted to destroy CH Wilder through a low fitness report, despite CH Wilder's outstanding accomplishments as a pastor and chaplain, evidenced by the size of his congregation. The Commanding General defeated CH Wilson's attempt by ordering him to rewrite the fitness report. CH Wilson retaliated further by not processing a reward promised to CH Wilder by the General for his performance.

CH Williams became enraged when he discovered CH Wilder was promoted to LCDR because "Wilder had managed to keep him from intervening" with CH Wilder's promotion opportunity. Wilder Deposition ("Wilder") [175:15-20]. CH Williams promised "he would ensure

that I never get selected for promotion" because "he had the power to do it." Id. [179:18-20].

CH Wilder became an Adair plaintiff in March 2000 while assigned to Camp Lejeune, NC. Fox News contacted him after Adair's Motion for Class Certification was granted. CH Wilder contacted the appropriate USMC authorities and asked for permission and guidance, including about wearing his uniform. He was told that was okay as long as he did not say anything inflammatory, i.e., something not factual. [189:1-192:21]. CH Wilder reported after the interview aired his command chaplain, Chaplain Moson, whose office was close to his, began receiving "a lot of phone calls from Chaplain Iasiello [the Deputy Chief of chaplains] office." [194:1-7]. Subsequently, CH Moson ordered CH Wilder to "not appear with the media in uniform again" [196: 1-4] and also told Wilder "Chaplain Iasello was hot about [the interview]" and "wanted me charged. Wanted this thing taken care of." [197:10-11].

CH Wilder also testified CH Scordo, a RC who became the acting command chaplain after Chaplain Moson left, told CH Wilder "he [Scordo] was a man under orders, and that his most important vow that he takes as a Catholic priest is his vow of obedience to his seniors and the Church, and this is in context of what had taken place here at Camp Lejeune. [200:16-20]. This referred to CH Wilder's removal from the training and operations billet, which was a "Commander" billet, and being placed in a Lieutenant Junior Grade billet over at the Brig, and that I not be utilized as the Senior Protestant, and ... everything that I could contribute to the Protestant program be totally not allowed", which CH Wilder described as marginalization. [200:24-201:8]. During his time, CH Scordo was running the chaplain's office from Virginia where he was recuperating from surgery,

CH Scordo directed a backdated fitness report be submitted for CH Wilder which was unfavorable, prompting CH Wilder to file a request for an investigation based on the retaliation

following his Fox News appearance. [224:7-229:17].

The investigator was a Reserve chaplain who told both CH Wilder and his counsel if CH Scordo had placed CH Wilder in a Lieutenant Junior Grade [LTJG] billet, that would be retaliation. The investigator was provided an official document describing the Brig chaplain's positions and the authorized rank, LTJG. The investigator did not find retaliation despite clear evidence of negative personnel actions against CH Wilder after his Fox News interview.

The CHC placed CH Wilder under abusive and hostile chaplain supervisors who retaliated against him and inflicted great stress and strain on CH Wilson and his family. His injuries include treatment as a second-class citizen, being denied a fair opportunity to compete for Commander, further promotions and a full career in the Navy as a result of the CHC's unlawful retaliation and failure to address and remove the tools that allowd destruction of his career.

CH Wilder was forced to retire due to statutory limits on FOS LCDRs.

aa. BARBY EARL WILSON (CFGC) entered the CHC in 1977 under an initial endorsement of the Church of God in Christ, a Non-liturgical Christian denomination. He served tours of duty at Governors Island, NY; Norfolk, VA; Little Creek Amphibious Base, VA; Okinawa; Fleet Religious Support Activity; duty as ship's chaplain; and Director of Pastoral Care Services in Saudi Arabia during the Gulf War. In 1983, he filed a religious discrimination charge against a Liturgical chaplain who would not allow CH Wilson to conduct religious services according to his Non-liturgical practices. His superior chaplain, a Lutheran, told him that if he expected to make the Navy a career he should drop his charge or change it from a religious to a racial discrimination charge. CH Wilson refused to do so on principle. In retaliation, his supervisory chaplain gave him bad fitness reports and promised he would make sure CH Wilson was not promoted to CDR, a promise which turned out to be true.

65

In 1986, he changed his endorsement to CFGC. Although promoted to LCDR, he was not selected for CDR, filling his Lutheran senior chaplain's promise. Throughout the remainder of his career, CH Wilson experienced continuing retaliation and prejudice in his treatment and assignments. The Chief of Chaplains, RADM Koneman, also a Lutheran, intervened several times to prevent CH Wilson from receiving career enhancing assignments. CH Wilson's command chaplain at Portsmouth Naval Hospital selected CH Wilson to accompany a hospital medical team sent to support the First Gulf War. The Chief make sure someone else was assigned to the team. A friend reported to CH Wilson, after the large number of expected casualties was briefed, the Chief said, "if things work out the right way, that [referring to estimated deaths] will take care of our problem" referring to CH Wilson.

CH Wilson retired in 1994 with 17½ years of service, having seen that religious and racial discrimination would not let him be promoted. That discrimination included clear retaliation from the Chief and his superior chaplains in assignments and fitness reports based on CH Wilson's religious practices and faith, and his opposition to interference in the conduct of his ministry, chaplain duties and worship services. He now lives at 505 Roves Court, Virginia Beach, VA.

CH Wilson's injuries include being treated as a second-class citizen, being denied a fair opportunity to compete for Commander, further promotions and a full career in the Navy. The CHC placed CH Wilson under abusive and hostile chaplain supervisors who unlawfully retaliated against him and inflicted great stress and strain on CH Wilson and his family.

### B. The Defendants

17.     The following U.S. Navy officials are sued as defendants in their official capacity only

a..     Defendant Secretary of Navy is an appointed official responsible for civilian

control of the U.S. Navy, including the Naval Reserve of which CH Harkness is a member. He is responsible for promotion boards and their procedures.

      b.     The Commander of the Naval Personnel Command administers the promotion boards at issue, including establishing and monitoring the promotion procedures, and establishes personnel management policies.

      c.     The Navy Chief of Chaplains. The Navy is organized into several branches or categories, i.e., subordinate groupings of individuals possessing similar qualifications or skills. The Navy Chaplain Corps ("CHC")is one of these branches, 10 U.S.C. § 5142, whose members are commissioned officers possessing specialized religious education, training and experience to meet the spiritual needs of those who serve in the Navy and their families. The Chief of Chaplains (the "Chief") is responsible for administering the CHC and meeting the Department of Navy's free exercise needs. He/she is a Rear Admiral ("RADM"), the highest ranking chaplain.

## V. THE CHC'S ILLEGAL RETALIATION AND PREJUDICIAL ACTIONS

## COUNT 1

## ILLEGAL RETALIATION

18.     The allegations in paragraphs 1 through 17 above are incorporated herein by reference as though pleaded in full.

19.     LCDR (Ret) Gary Heinke's Declaration at Exhibit 10 shows the depth of hatred, prejudice, arrogance and animosity by the senior CHC leadership, including the Chief, against plaintiffs, junior Non-Liturgical chaplains doing their duty to faithfully represent their endorsing agencies, serve the military personnel they represent and their commanders and ministry will do all Department of Navy ("DON") personnel. This animosity is reflection of the historic animosity of Liturgical versus Non-liturgical theologies the religion clauses are supposed to prevent. The

CHC's illegal retaliation and motivation, destroying plaintiffs' careers seemingly out of spite, is unconstitutional.

20.     The Navy's failure to provide objective criteria for measuring chaplain performance in its fitness reports allowed hostile supervisory chaplains and commanders to use subjective criteria unrelated to chaplain ministry to facilitate discrimination and/or retaliation against plaintiffs.

21.     The Navy and/or CHC through certain senior chaplains have illegally retaliated, punished, harmed or otherwise deprived these plaintiffs of their established rights to provide service to Navy personnel; a fair opportunity to compete for appropriate promotions, assignments and career opportunities; and a career. These illegal actions responded to plaintiffs' exercise of their constitutional, statutory and regulatory rights and objecting to senior chaplains' abuse of power that clearly conveyed the message of second-class citizenship. This included improper and illegal burdens on plaintiffs' ministry, restrictions on their rights to represent their endorsing organizations, and marginalization of their actual service and limitation on career opportunities.

a.      Such retaliation and its harmful consequences are in response to plaintiffs' exercise of their rights and responsibility to represent their endorsing faith group; meet Non-liturgical DON personnel religious needs; expose CHC or Navy misconduct, prejudice, bias, and illegality; and/or in bringing Chaplaincy to defending their rights.

b.      Whether the retaliation was the result of individuals acting on their own or responding to real or imagined slights, denominational bias, "payback" for exposing wrongdoing, or advancing the CHC's policy of protecting its pro-Liturgical culture is immaterial. The CHC and Navy leadership condoned and encouraged the abuse of unbridled power delegated to chaplain board members by failing to effectively address abuses, retaliation and denominational preference despite numerous warnings and

evidence.

c.      The Navy and the CHC was aware of the actual denominational preferences, retaliation and prejudice by IG investigations, CAPT Larry Ellis' report on Non-liturgical detailing, Exhibit 11, and complaints from chaplains that led to the Center for Naval Analysis ("CNA") study of CHC promotions, Exhibit 12 (showing consistent denominational preferences in promotion rates each rank with RC's always highest, Liturgical second). The Navy and the CHC were aware of certain senior chaplains had a pattern of abusive conduct, retaliation and religious and racial prejudice.

d.      IG inspections, the CNA report and BCNR appeals and decisions made the Navy and CHC aware of the potential for and actual abuse and retaliation through denominational networking and the challenged selection board procedures' delegated unbridled power and lack of accountability. Defendant failed to prevent or remediate retaliation, denominational preferences and abuse.

22.    The Navy and the CHC were on notice and aware of the ability of senior chaplains to retaliate against junior chaplains through the use of denominational networks and personal relationships with board members but failed to provide effective guarantees such illegal practices, denominational factors or considerations would not influence selection board decisions or violate religious neutrality in awarding government benefits such as promotions.

23.    The challenged procedures are unconstitutional under the First and fifth Amendments because they lack effective guarantees denominational or religious factors cannot influence or determine selection for promotion or selective early return. These procedures also preclude court carefully examining the decision process that uses denominational representatives to award benefits to similar or other denominational representatives in order to ensure that decisions are

denominationally neutral

24      Statistical analysis of 38 years of CHC promotions, Exhibit 2, show 80% of promotion

board memberships were filled by five denominations, producing consistent denominational

hierarchies. This is per se an unconstitutional religious preference.

## COUNT 2

25.     The allegations in paragraphs 1 through 24 above are incorporated herein by reference as

though pleaded in full.

26.     10 U.S.C. § 613a's ban on discovery is unconstitutional under the First and Fifth

amendments as applied to claims of unconstitutional retaliation and denominational preferences.

        a.      Witness of CHC selection board proceedings, including some plaintiffs, can and

are willing provide personal testimony of retaliation and religious preference and prejudice

supporting plaintiffs' claims.

        b.      The Secretary's waiver of the oath of secrecy and § 613a's protection of broad

proceedings for some denominational representatives but not for plaintiffs violates the First and

Fifth Amendments.

## COUNT 3

### CONSTRUCTIVE DISCHARGE OF CERTAIN PLAINTIFFS

27.     The allegations in paragraphs 1 through 26 above are incorporated herein by reference as

though pleaded in full.

28.     The CHC through its challenged procedures enabling retaliation created a hostile

environment, and used the realities of the "up or out" Navy promotion system and separation

process to make working conditions intolerable for certain of these plaintiffs who (a) after being

FOS, left the Navy rather than endure more hostility, abuse, family stress, and humiliation; or (b)

when eligible, chose to retire under the TERA or other programs lest they be separated from the Navy with nothing.

29.     The following plaintiffs were constructively discharged because, as a result of retaliation, they had to retire due to FOS and/or statutory time in service or grade limits, or other hostile action: Blair, Klappert, LaValle (98), Quiles, Spalding (TERA), and Wilson (TERA).

## COUNT 4

## THE NAVY HAS DISCRIMINATED AGAINST NON-LITURGICAL CHAPLAINS' RELIGIOUS FREE SPEECH

30.     The allegations contained in paragraphs 1 through 29 of the Complaint are incorporated herein by reference as though pleaded in full.

31.     Defendants, through some of its senior chaplains, illegally disapproved of, censored, or criticized the Non-liturgical religious speech of chaplains Belt, Lindsay, Royston, Torralva, Wilder and Wilson. Such speech is inherent in their Non-liturgical tradition, practice and worship and protected by the First Amendment and 10 U.S.C.§ 6031 (allows chaplains to conduct public worship according to the customs and norms of the churches of which they are members), and Naval Regulation 0817 which mirrors § 6031.

## Count 5

## Religious Freedom Restoration Act ("RFRA" )Violations.

32.     The allegations contained in paragraphs 1 through 31 above of the Complaint are incorporated herein by reference as though pleaded in full.

33.     Plaintiffs claim the challenged actions and procedures result in unconstitutional retaliation and denominational preferences and therefore violate the Constitution, statutes and Navy regulations. If the Court finds the challenged procedures neutral, the Navy's actions taken against

these plaintiffs as described in this Complaint and which may be further identified or expanded

through discovery will have violated RFRA. The challenged procedures and alleged retaliatory

actions have also substantially burdened his free exercise of religion without a compelling

government purpose and are not the least restrictive means to achieve any such government

purpose or objective. This violates RFRA, 42 U.S.C. § 2000 bb.

## VI.  PRAYER FOR RELIEF

**WHEREFORE**, plaintiffs pray for a declaration, judgment and other relief against the

defendants as described below.

**A.**    **Declaratory Relief and Judgement.**  The allegations in ¶¶ 1 through 32 above

show there are bona fide disputes between the plaintiffs and defendants concerning whether (1)

the above challenged actions by senior chaplains and the CHC constitute retaliation against the

plaintiffs' lawful exercise of their rights under the First Amendment's Establishment, Free

Exercise, Free Speech and Right to Petition Clauses and the Fifth Amendment's Due Process

(equal protection) Clause, RFRA, and DOD and Navy regulations; and (2) the legality of the

defendants' challenged procedures as instruments of retaliation. Pursuant to 28 U.S.C. §§ 2201

and 2202, plaintiffs request this Court render a Declaratory Judgment and an Order that provides

the following specific relief.

**Count 1.**  A declaration and order that:

a.    The defendants' actions against plaintiffs as described herein and as later

developed during the litigation was illegal retaliation and denominational prejudice;

b.    The challenged promotion procedures are improper and unconstitutional tools and

means of retaliation because they delegate unbridled discretionary power to persons defined by

their religious identity with no guarantees denominational factors, including retaliation, do not

72

influence decisions concerning promotion and SER boards and career enhancing assignment;

      c.      Require the defendants to address and remove the penalties to specific plaintiffs' careers caused by retaliation and hold new promotion and SER boards using procedures with effective guarantees that denominational factors or undue religious influence do not influence the new CHC selection board decisions;

      d.      Enjoin the defendants to remedy the harms to plaintiffs' records, including retaliatory fitness reports that harmed plaintiffs. This should include, where necessary, the Secretary's directive to board members that certain negative reports were illegal and retaliatory, should be viewed in that light, and the plaintiffs performance should be considered exemplary lacking unbiased evidence to the contrary, and reminding the board members of their duty to  to make the plaintiff whole by remedying the CHC's retaliation, prejudice, and misconduct; and

      e.      Other remedies as appropriate to compensate for the damage done to plaintiffs' careers and families by the defendants' failure to protect plaintiffs from retaliation and other unlawful acts.

**Count 2.**  A declaration and Order that

      a.      10 U.S.C. § 613a's ban on discovery is unconstitutional under the First and Fifth amendments as applied to claims of unconstitutional retaliation and denominational preferences, and,

      b.      an Order requiring the Secretary to release board members from their oath of secrecy and cooperate with plaintiffs' discovery efforts.

**Count 3.**  A declaration and Order that

      a.      declares defendants constructively discharged certain plaintiffs as alleged; and

      b.      requires the Navy to remedy the harms to plaintiffs' records, including addressing

retaliatory fitness reports that harmed plaintiffs;

      c.      remedies the harm to plaintiffs' careers caused by their illegal discharges, including reinstatement to active duty and back pay until they can be considered by validly constituted promotion boards, and if selected for promotion, appropriate remedies to compensate for the illegally terminated careers, consistent with the guiding principle of making the plaintiffs whole for the government's misconduct.

**Count 4.** A declaration and order finding the Navy discriminated against certain non-liturgical chaplains' religious free speech and an order requiring defendants to remedy the damage to specific plaintiffs' careers by senior chaplains' or commanders' prejudicial actions resulting from hostility to plaintiffs' Non-liturgical religious speech.

      Furthermore, plaintiffs request a declaration and an order that defendants have pursued this litigation in bad faith, ignoring their own investigations, evidence, reports and studies, and their obligation under Rule 11 and duty of candor to the court. Defendants litigation tactics, including failure to provide relevant documents, have harmed plaintiffs by delaying justice and allowing the spoliation, loss or destruction of evidence, including faded memories. This has caused plaintiffs to incur unnecessary expenses.

**Count 5.** In the event the Court finds the above challenged procedures are neutral, plaintiffs request a declaration and an order the challenged procedures violate RFRA by burdening ITS' religious exercise without a compelling government purpose or using the least restrictive means possible.

**B.**      **Attorneys' Fees and Other Relief**

      1.      Plaintiffs request this Court award plaintiffs the reasonable costs and expenses of this action, including expert and attorneys' fees in accordance with the Equal Access to

Justice Act, 28 U.S.C. § 2412; the Civil Rights Act, 42 U.S.C. § 1988; the Religious

Freedom Restoration Act, 42 U.S.C. § 2000-bb; and/or any other applicable statue or rule

of law or equity.

2.      Plaintiffs request this Court:

a.      Retain jurisdiction of this matter for the purposes of enforcing the Court's

orders and ensuring full relief; and

b.      The Court provide other such relief as may become apparent in the course

of litigation.

Respectfully submitted,

Dated: February 28, 2019

/ S/ Arthur A. Schulcz Sr.
ARTHUR A. SCHULCZ SR.
Chaplains Counsel, PLLC
Counsel for the Plaintiffs
VA Bar. No. 70 31
21043 Honeycreeper Place
Leesburg, VA, 20175
art@chaplainscounsel.com
703-645-4010

## EXHIBIT LIST

Exhibit No.    Description of Exhibit

1.    Table identifying eight sources for the 27 plaintiffs' retaliation claims

2.    Dr. Harald R. Leuba, PhD, "38 Years of Denominational Preference"

3.    Chaplain Corps Selection Voting Machine with Five Buttons:  0, 25, 50, 75, 100

4.    Testimony of RADM Barry Black, Chief of Chaplains, to the Naval Inspector
General Describing "Zeroing Out" and How the Zero Vote Destroys Careers and
Manipulates the Board

5.    Testimony of CDR Mary Washburn (NIG complainant) to the Naval Inspector
General Describing Common Occurrence of "Zeroing Out" on Promotion
Numerous Boards She Had Served on

6.    Denominational makeup of CHC promotion board members from FY 49 through
FY 2002 from records Sturm v. Danzig, 99-cv-2272 (S.D. Cal) and Adair

7.    Declaration of LCDR Jerry  Dickerson, CHC, USN

8.    CAPT Jack Stafford, Report on his investigation of the CHC's FY 1997 and 98
Commander boards in response to a complaint of religious discrimination

9.    Declaration CDR Tim Demy

10.    Declaration of LCDR Gary Heinke

11.    CAPT Larry Ellis' report on Non-liturgical detailing

12.    Center for Naval Analysis study of CHC promotions 1972-2000